**UNITED STATES DEPARTMENT OF AGRICULTURE**
**OFFICE OF THE SECRETARY**
**NATIONAL APPEALS DIVISION**

In the matter of                    )
                                       )

XXXXX, XXXXX,          )
XXXXX                     )
                                       )

and                            )      Case No. 2022S000039
                                       )

RISK MANAGEMENT AGENCY   )
                                       )

## APPEAL DETERMINATION

XXXXX (Appellant1 (XXXXX)), XXXXX (Appellant2 (XXXXX)), and the XXXXX (Appellant3 (XXXXX)) (collectively Appellants) insured their Crop Year (CY) 2017 burley tobacco under Multiperil Crop Insurance (MPCI) policies through their Approved insurance Provider (AIP, XXXXX (XXXXX). After experiencing crop losses, Appellants filed notices of loss with XXXXX claiming excessive precipitation / moisture as their cause of loss. XXXXX denied Appellants' loss claims, assigning all of Appellants' losses to their failure to follow Good Farming Practices (GFP). Appellants challenged XXXXX's GFP decisions before Risk Management Agency (RMA or Agency). RMA, on review, upheld XXXXX's GFP decisions as they related to Appellants' post-emergence weed control measures but reversed XXXXX's decisions as they related to Appellants' application of Nitrogen, their use of Muriatic Potash, and their use of a mixture of herbicides to meet pre-emergence herbicide requirements. As XXXXX assigned all of Appellants' losses to a failure to follow GFP, the parties proceeded to arbitration. The Arbitrator found Appellants' losses were due to excessive precipitation / moisture and awarded the full indemnity due under their policies with interest. Appellants then sought a finding from RMA under their Common Crop Insurance (CCI) Policy Basic Provisions § 20(i) in order to proceed with a claim for extracontractual damages in federal court. On December 3, 2021, RMA denied Appellants' request for a favorable §20(i) finding. In doing so, RMA found Appellants failed to demonstrate XXXXX failed to follow Federal Crop Insurance Corporation (FCIC) policies and procedures in adjusting Appellants' loss claims. Further, RMA found Appellants received the full indemnity due under their policies plus interest. Appellants timely sought review of RMA's December 3, 2021, decision before the National Appeals Division (NAD).

Appellants argue that RMA erred in denying their request for a § 20(i) finding. In making this argument, Appellants contend that XXXXX failed to follow policies and procedures when adjusting their CY 2017 loss claims. Given the state of the evidence following RMA's GFP decisions, Appellants argue that XXXXX violated FCIC policies and procedures when it failed to re-evaluate their claims as both insured and uninsured causes of loss were present. Specifically, Appellants contend that FCIC policies and procedures required XXXXX to assign percentages of loss between the insured causes of loss and the uninsured cause of loss. As part of this process, Appellants noted that FCIC procedures reference the use of comparable acreage, something XXXXX failed to do. Further, Appellants point out that FCIC procedures required XXXXX to obtain an expert opinion, something XXXXX did not do until just prior to arbitration. Finally, while Appellants concede they received the full indemnity due under their policies with interest, they contend that XXXXX's actions in handling their loss claims meant that they did not receive what they were entitled to prior to arbitration and that, as a result, Appellants suffered economic losses far in excess of the payment due under their policies. To the

EXHIBIT

14

extent RMA is correct that a requestor can never receive a § 20(i) finding if they receive the full amount under their policies, Appellants argue that RMA has created a situation where a requestor who loses at arbitration can seek extracontractual damages but a requestor who wins at arbitration cannot.

At Appellants' request, I held a telephone hearing on March 2, 2022, and continued the hearing on April 13, 2022; May 25, 2022; June 22, 2022; August 3, 2022; October 5, 2022; October 26, 2022; and November 30, 2022. I concluded the hearing on January 25, 2023. I left the record open to receive post-hearing submissions. On March 1, 2023, RMA submitted Agency Post-Hearing Exhibit 1. Also on March 1, 2023, Appellants submitted Appellants' Post-Hearing Exhibits A to D. Later that same day, Appellants responded to my email, confirming Appellants' Post-Hearing Exhibit D is a copy of Appellants' Post-Hearing Exhibit C and, as such, Appellants withdrew Appellants' Exhibit D. Finally, on March 1, 2023, XXXXX submitted XXXXX Post-Hearing Exhibit A.

On March 22, 2023, RMA requested an extension to the deadline for the submission of closing arguments. As grounds for the request, RMA noted that the Agency Representative had experienced a medical emergency. Based on RMA's request, and with no objection from Appellants or XXXXX, I approved a one-week extension to the deadline and issued a Notice of Revised Deadline for Submission of Closing Arguments. On March 29, 2023, RMA submitted a nine-page closing argument, which I labeled Agency Post-Hearing Exhibit B. On March 29, 2023, Appellants submitted Appellants' Post-Hearing Exhibit D. On March 29, 2023, XXXXX submitted XXXXX Post-Hearing Exhibit B. Except for Appellants' initial Post-Hearing Exhibit D, which was withdrawn as redundant, I admitted the post-hearing exhibits into the Case Record without objection and closed the record on March 29, 2023. As the result of the complexity of the Appeal Record,[1] the Regional Director for NAD's Southern Region approved an extension of the deadline for issuing the determination in this case. The extension ran through June 16, 2023.

Based on the evidence, the arguments the parties submitted, and the program regulations that apply, I conclude that RMA erred as to the issue of XXXXX's compliance with FCIC policy and procedures but did not err as it relates to Appellants' receipt of the full indemnity due under their policies, with interest. As Appellants failed to show error as to both issues, I find RMA did not err in denying Appellants' request for a § 20(i) finding under the CCI Policy Basic Provisions. The rationale for my decision follows.


## BACKGROUND

The purpose of the Federal Crop Insurance Act (FCIA) is "to promote the national welfare by improving the economic stability of agriculture through a system of crop insurance and providing the means for the research and experience helpful in devising and establishing such insurance." *See 7 United States Code (U.S.C.) § 1502(a)*. To further these purposes, Congress established the FCIC as a government-owned corporate body and agency within the United States Department of Agriculture (USDA). In accordance with the FCIA (7 U.S.C. § 1501 *et seq*), the FCIC or AIPs that enter into a Standard Reinsurance Agreement with the FCIC deliver crop insurance to producers. *See 7 Code of Federal Regulations (C.F.R.) Part 400, Subpart T; 7 C.F.R. §457.2(a) & (b)*.

RMA administers the Federal Crop Insurance Program (FCIP) on behalf of FCIC. *See 7 U.S.C. § 6933*. As a rule, Federal crop insurance laws and regulations preempt State and local laws and regulations. *See 7 C.F.R. § 400.352*. However, the regulations go on to note that "[n]othing precludes such damages being imposed against the [AIP] if a determination is obtained from FCIC that the company, its employee, agent or loss adjuster failed to comply with the terms of the policy or procedures issued by FCIC and such failure resulted in the insured receiving a payment in an amount

that is less than the amount to which the insured was entitled[.]" *7 C.F.R. § 400.352(b).* Further, as required by 7 C.F.R. § 400.352(a), such authority is specifically authorized by FCIC in § 20(i) of the CCI Policy Basic Provisions. The dispute in this case surrounds both whether XXXXX complied with the terms of FCIC policy and procedures, and whether such failure resulted in Appellants receiving an amount that was less than what they were entitled to under their MPCI policies.

## STATEMENT OF THE ISSUES

The issue for me to resolve in this case is whether RMA's decision denying Appellants' request for a § 20(i) finding under their CCI Policy Basic Provisions is in accordance with the regulations governing the FCIP. The questions I must answer to resolve this issue include the following:

1. Did RMA err in finding Appellants failed to show XXXXX did not comply with FCIC policies and procedures in handling Appellants' CY 2017 burley tobacco claims?

2. Did RMA err in finding that Appellants received the total indemnity due under their policy? If no, did RMA err in finding this was a basis for denying Appellants' request for a favorable determination under ¶ 20(i) of the CCI Policy Basic Provisions?

## FINDINGS OF FACT (FOF)

*Note: Because of the presence of a large number of chain emails in the Agency Record (AR) and the Exhibits, I have included a time in parenthesis following the email date in some instances to avoid confusion as to which email is being referenced,*

1. Appellant1 (XXXXX) grew up on a farm started by his Grandparents, XXXXX (herein after Farmer1 (XXXXX)) and Appellant3 (XXXXX); and carried on by his father, Appellant2 (XXXXX)). Appellant1 (XXXXX)'s brother, XXXXX (Farmer2 (XXXXX)), also participates in the family farm.[2] This appeal arises from the Appellants' tobacco operation. In CY 2017, Appellants' tobacco operation included greenhouses, field operations, and drying barns.[3] Although crops were certified and insured in individual names, the operations were conducted as a family farm, with everyone helping with the various tasks as needed. *(Appellants' Exhibit P, pages 1 – 12; Appellants' Exhibit Q, pages 1 – 21; Appellants' Exhibit R, pages 1 – 6; Appellants' Post-Hearing Exhibit D, pages 6 – 7; Hearing Audio (HA), Track (Trk) 7, 44:35 – 47:05.)*

2. On August 19, 2013, Appellants formed XXXXX (Corp1), with Appellant1 (XXXXX) as the registered agent. The registered agent was subsequently changed to Appellant2 (XXXXX). While Appellants used the corporation for portions of their operations dealing with migrant workers, they continued to farm individually and certify crops in their own names. *See Agency Record (AR), pages 4575, 6694, 6899, & 7821.)*

3. On February 25, 2016, Appellants obtained the following continuous coverage MPCI from XXXXX:

   - Appellant1 (XXXXX) obtained coverage for burley tobacco in XXXXX County and XXXXX County, XXXXX. *(AR, 2748 – 2752.)*
   - Appellant2 (XXXXX) obtained coverage for burley tobacco in XXXXX County and XXXXX County, XXXXX. *(AR, pages 2738 – 2742.)*

- Farmer1 (XXXXX) obtained coverage for burley tobacco in XXXXX County, XXXXX. *(AR, pages 2743 – 2747.)*

On July 13, 2016, Appellant1 (XXXXX) submitted an MPCI Application and Transfer Form to XXXXX adding burley tobacco coverage for XXXXX County, XXXXX. As these MPCI policies offered continuous coverage, the Appellants' burley tobacco coverage continued in CY 2017. *(AR, pages 2753 – 2755; Appellants' Post-Hearing Exhibit D, pages 2 & 7 – 8; HA, Trk 8, 46:26 – 4740.)*

4. On December 27, 2016, XXXXX sent Appellant1 (XXXXX) and Farmer1 (XXXXX) initial letters confirming their updated policy information for CY 2017. On January 24, 2017, XXXXX sent Appellant1 (XXXXX), Appellant2 (XXXXX), and Farmer1 (XXXXX), letters confirming their updated policy information for CY 2017. *(AR, pages 2777 – 2858, 2998 – 2999, 3142 – 3143, & 6764 – 6833.)*

5. For CY 2017, Appellant1 (XXXXX) certified planting the following burley tobacco:

- 66.76 acres in XXXXX County, and 67.1 acres in XXXXX County,[4] XXXXX, to include:

| Farm Serial Number (FSN) | Tract | Field | Reported Acres | Plant Date | Total for Tract |
|---|---|---|---|---|---|
| 4920 | 19541 | 3A | 7.34 | 06/17/17 | |
| | | 4A | 6.00 | 06/17/17 | |
| | | 4B | 5.20 | 06/17/17 | |
| | | 4C | 4.90 | 06/17/17 | |
| | | 5A | 7.10 | 06/17/17 | |
| | | 5B | 15.50 | 06/17/17 | |
| | | 5C | 10.57 | 06/17/17 | |
| | | 5D | 10.15 | 06/17/17 | 66.76 |
| 5318 | 19723 | 2A | 15.40 | 06/03/17 | |
| | | 2B | 10.20 | 06/03/17 | |
| | | 4A | 15.9 | 06/03/17 | |
| | | 4B | 15.10 | 06/03/17 | |
| | | 7A | 4.80 | 06/03/17 | |
| | | 7B | 5.70 | 06/27/17 | 67.10 |

- 44.00 acres in XXXXX County, XXXXX, to include:

| FSN | Tract | Field | Reported Acres | Plant Date | Total for Tract |
|---|---|---|---|---|---|
| 553 | 949 | 1A | 4.00 | 06/20/17 | |
| | | 2A | 8.00 | 06/20/17 | |
| | | 3A | 8.00 | 06/20/17 | 20.00 |
| 2320 | 956 | 1A | 9.00 | 06/21/17 | 9.00 |
| | 965 | 1A | 15.00 | 06/21/17 | 15.00 |

- 8.00 acres in XXXXX County, XXXXX, to include:

| FSN | Tract | Field | Reported Acres | Plant Date | Total for Tract |
|---|---|---|---|---|---|

| 7359 | 3292 | 1A | 4.00 | 06/27/17 | 4.00 |
|------|------|-----|------|----------|------|
|      | 9877 | 1A | 4.00 | 06/27/17 | 4.00 |

*(AR, pages 2921 – 2926; Appellants' Exhibit J, 45 – 48, 61 – 68, 83 – 84, & 89 – 92; Appellants' Exhibit P, pages 4 – 5, 8 – 9, & 11 -12.)*

6. For CY 2017, Appellant2 (XXXXX) certified planting 124.66 acres of burley tobacco in XXXXX County, XXXXX, to include:

| FSN | Tract | Field | Reported Acres | Plant Date | Total for Tract |
|-----|-------|-------|----------------|------------|-----------------|
| 9 | 93 | 1A | 4.00 | 06/18/17 | 4.00 |
| 103 | 663 | 1A | 1.00 | 06/15/17 | |
|  |  | 1B | 4.50 | 06/15/17 | |
|  |  | 1C | 25.60 | 06/15/17 | 31.10 |
| 178 | 662 | 1A | 47.80 | 06/14/17 | |
|  |  | 2A | 12.80 | 05/09/17 | |
|  |  | 4A | 4.30 | 05/09/17 | |
|  |  | 6A | 10.00 | 05/09/17 | |
|  |  | 8A | 1.00 | 05/09/17 | |
|  |  | 9A | 7.40 | 05/09/17 | |
|  |  | 10A | 2.00 | 05/09/17 | 85.30 |
| 800 | 61 | 1 | .96 | 06/27/17 | .96 |
| 3777 | 625 | 3A | 3.30 | 05/15/17 | 3.30 |

Appellant2 (XXXXX) did not certify any burley tobacco for XXXXX or XXXXX Counties, XXXXX, for CY 2017. *(AR, pages 3068 – 3073; Appellants' Exhibit K, pages 1 – 24 & 30 – 33; Appellants' Exhibit Q, pages 8 – 17, 19, & 21.)*

7. For CY 2017, Farmer1 (XXXXX) certified planting 136.07 acres of burley tobacco in XXXXX County, XXXXX, to include:

| FSN | Tract | Field | Reported Acres | Plant Date | Total for Tract |
|-----|-------|-------|----------------|------------|-----------------|
| 966 | 133 | 1 | 26.18 | 05/18/17 | 26.80 |
| 3410 | 126 | 1 | 25.50 | 05/20/17 | 25.50 |
| 3655 | 647 | 1A | 9.00 | 05/11/17 | |
|  |  | 1B | 4.00 | 05/11/17 | |
|  |  | 1C | 3.72 | 05/11/17 | |
|  |  | 2A | 5.00 | 05/11/17 | |
|  |  | 3A | 11.63 | 05/11/17 | |
|  |  | 4A | 8.00 | 05/11/17 | |
|  |  | 5A | 12.00 | 05/11/17 | 53.35 |
| 5089 | 1113 | 2A | 9.05 | 05/03/17 | 9.05 |
|  | 1453 | 1A | 4.87 | 06/26/17 | |
|  |  | 2A | 16.50 | 06/26/17 | 21.27 |

Farmer1 (XXXXX) did not certify any burley tobacco for XXXXX County, XXXXX, for CY 2017; nor did Farmer1 (XXXXX) certify any crops for XXXXX County, XXXXX, for CY 2017. *(AR, pages 6748 – 6752; Appellants' Exhibit L, pages 13 – 20, 26 – 29, 37 – 42, & 55 – 57; Appellants' Exhibit R, pages 4 – 6 & 21.)*

8. On May 30, 2017, XXXXX sent a Spot Check Notice to Appellant2 (XXXXX) advising him that RMA had identified his CY 2017 burley tobacco for a growing season spot check. XXXXX advised Appellant2 (XXXXX) that this spot check would include at least two field visits, one after planting and one just before harvest. *(AR, pages 14 – 15 & 4995 – 4996.)*

9. On June 8, 2017, XXXXX received three Notice of Loss (NOL) forms from Appellants:

   - Appellant1 (XXXXX). *(AR, pages 3228 – 3229, 4202 – 4203, 4921 – 4922, & 7567 – 7568.)*
   - Appellant2 (XXXXX). *(AR, pages 3230 – 3231 & 8335 – 8336.)*
   - Farmer1 (XXXXX). *(AR, pages 3232 – 3233 & 6418 – 6419.)*

   Each of the NOL forms list Excessive Moisture/Precipitation, occurring on June 5, 2017, as the cause of loss. Further, the producers identified June 8, 2017, as the date the loss was apparent. *(Appellants' Post-Hearing Exhibit D, page 8; XXXXX Post-Hearing Exhibit A, pages 2 – 3; HA, Trk 8, 48:40 – 49:30.)*

10. XXXXX assigned XXXXX (Adjuster1 (XXXXX)), a XXXXX Adjuster, as the adjuster on Appellants' loss claims. On June 8, 2017, Adjuster1 (XXXXX) contacted Appellants concerning their claims. Appellant1 (XXXXX) indicated Appellants experienced excessive rain and that they expected their tobacco to show signs of damage within the week. Adjuster1 (XXXXX) indicated he would set up a date to look at the tobacco once Appellants had a chance to review the damage. *(AR, pages 4918, 5555, & 5558; Appellants' Post-Hearing Exhibit D, page 8.)*

11. Following his initial field visit on June 16, 2017, Adjuster1 (XXXXX) completed a contact log entry specifically noting that Farmer1 (XXXXX)'s tobacco was damaged by heavy rain. Further, Adjuster1 (XXXXX) noted that Farmer1 (XXXXX) had at least three acres completely drowned out. The entry did not indicate which FSN or FSNs included the three acres referenced. Further, Adjuster1 (XXXXX) did not include any photographs to document the condition of the crops on Appellants' 14 FSNs. *(AR, page 5558.)*

12. XXXXX assigned XXXXX[5] (AdjTrainee (XXXXX)), a XXXXX Adjuster Trainee, to complete the Growing Season Inspection on Appellant2 (XXXXX). On July 7, 2017, AdjTrainee (XXXXX) completed a field visit with photographs of the following:

   - Of FSN 178, with language indicating Appellants had not sprayed but had plowed the field. *(AR, pages 3456 – 3457, 3464 – 3465, 3970 – 3971, 4032 – 4033, & 5949 – 5950.)*
   - Of FSN 800, with language indicating new plants. *(AR, pages 3256 – 3257, 3260, 4005, 4067, 4997, 5018, 5079 – 5080, 5083, 5259 – 5360, 5363, & 7743.)*

   AdjTrainee (XXXXX) did not provide photographs concerning the condition of the crops on Appellant2 (XXXXX)'s three remaining FSNs. *(AR, page 5238; XXXXX Exhibit G, pages 18 – 19.)*

13. On July 7, 2017, XXXXX recorded Acreage Reports from Appellant1 (XXXXX),[6] Appellant2 (XXXXX),[7] and Farmer1 (XXXXX).[8] In turn, XXXXX recorded the following Schedules of Insurance for the Appellants:

- For Appellant1 (XXXXX):

| Date | Agency Record (AR) | Total Acres | Total Liability | Total Premium | Total Subsidy | Prem & Fees due |
|---|---|---|---|---|---|---|
| 09/14/17 | AR, pages 2892 – 2907 & 4169 – 4172. | 185.96 | $514,404.00 | $377,439.00 | $238,048.00 | $139,391.00 |
| 09/25/17 | AR, pages 2908 – 2913. | 185.96 | $514,404.00 | $362,184.00 | $228,425.00 | $133,759.00 |
| 09/27/17 See Note 1 | AR, pages 2914 – 2920. | 185.96 | $421,238.00 | $319,696.00 | $201,622.00 | $118,074.00 |
| 08/27/20 | AR, pages 8601 – 8603, & 12087 – 12089; HA, Trk 8, 1:28:35 – 1:28:50. | 185.96 | $503,891.00 | $339,915.00 | $214,378.00 | $125,537.00 |

*Note 1 – XXXXX confirmed the September 27, 2017, Schedule of Insurance on December 29, 2017; January 25, 2018; February 22, 2018; and June 8, 2020. (AR, pages 2989 – 2992, 4368 – 4370, 5125 – 5127, 5561 – 5563, 5770 – 5781, & 7572 – 7574.)*

- For Appellant2 (XXXXX):

| Date | Agency Record (AR) | Total Acres | Total Liability | Total Premium | Total Subsidy | Prem & Fees due |
|---|---|---|---|---|---|---|
| 07/25/17 See Note 1 | AR, pages 3060 – 3063. | 124.66 | $322,695.00 | $166,168.00 | $104,808.00 | $61,360.00 |

*Note 1 – XXXXX confirmed the July 25, 2017, Schedule of Insurance on September 14, 2017; December 29, 2017; January 25, 2018; February 28, 2018; and June 8, 2020. (AR pages 3064 – 3067, 3074 – 3077, 4173 – 4176, 5208 – 5209, 5564 – 5565, 5782 – 5791, & 8339 – 8340.)*

- For Farmer1 (XXXXX):

| Date | Agency Record (AR) | Total Acres | Total Liability | Total Premium | Total Subsidy | Prem & Fees due |
|---|---|---|---|---|---|---|
| 07/25/17 See Note 1 | AR, pages 6738 – 6740. | 136.07 | $424,777.00 | $195,216.00 | $123,132.00 | $72,084.00 |

*Note 1 – XXXXX confirmed the July 25, 2017, Schedule of Insurance on September 14, 2017; February 22, 2018; and June 8, 2020. (AR, pages 4177 – 4179, 5566 – 5567, 5792 – 5801, 6429 – 6430, & 6743 – 6745.)*

14. On July 21, 2017, AdjTrainee (XXXXX) completed another field visit for Appellant2 (XXXXX) with photographs of the following:

- Of FSN 103. *(AR, pages 3259, 3261 – 3264, 5082, 5084 – 5087, 5362, & 5364 – 5367.)*
- Of FSN 178. *(AR, pages 3272, 3275 – 3278, 3454 – 3455, 3462 – 3465, 3968 – 3969, 4030 – 4031, 5095, 5098 – 5101, 5375, 5378 – 5381, 5947 – 5948, & 7684 – 7685.)*

- Of FSN 3777. *(AR, pages 3280 – 3281, 3452 – 3455, 3459 – 3460, 3462 – 3463, 3968 – 3969, 4030 – 4031, 5103 – 5104, & 5383 – 5384.)*

AdjTrainee (XXXXX) did not provide photographs concerning the condition of the crops on Appellant2 (XXXXX)'s two remaining FSNs. *(AR, page 5238; XXXXX Exhibit G, pages 1 – 21.)*

15. Although Adjuster1 (XXXXX)'s contact log reflects the visit took place on July 27, 2017, the pictures provided by Adjuster1 (XXXXX) and AdjTrainee (XXXXX) are dated for a field visit on July 26, 2017. The photographs included the following:

- For Appellant1 (XXXXX) of FSN 4920, with language indicating that the grass, which had been sprayed, was turning color and dying. *(AR, pages 3298 – 3301, 3378 – 3381, 3532 – 3535, & 3637 – 3640; XXXXX Exhibit M, pages 285 – 288.)*
- For Appellant1 (XXXXX) of FSN 5318, with language indicating the fields had drowned out spots and were very clean with few weeds. *(AR, pages 3287 – 3289, 3367 – 3369, 3554 – 3556, & 3626 – 3628; XXXXX Exhibit M, pages 274 – 276.)*
- For Appellant1 (XXXXX) of FSN 553, with language indicating the fields had drowned out spots and were very clean with few weeds. In addition, some photographs noted that the fields had some stress spots due to moisture but were clean with few weeds. *(AR, pages 3295 – 3297, 3375 – 3377, 3468 – 3470, & 3634 – 3636; XXXXX Exhibit M, pages 282 – 284.)*
- For Appellant1 (XXXXX) of FSN 2230,[9] with language indicating the fields had drowned out spots and were very clean with few weeds. *(AR, pages 3290 – 3294, 3370 – 3374, 3486 – 3490, & 3629 – 3633; XXXXX Exhibit M. pages 277 – 281.)*
- For Appellant2 (XXXXX) of FSN 3777. *(AR, pages 5105, 5385, & 3282.)*
- For Farmer1 (XXXXX) of FSN 3655, with language indicating the fields had some drowned out spots. In addition, some photographs noted the fields were very weedy with some very clean spots. *(AR, pages 3574 – 3588, 3641 – 3655, 3807 – 3821, 3861 – 3875, & 6394 – 6408; XXXXX Exhibit M, pages 121 – 135.)*
- For Farmer1 (XXXXX) of FSN 5089, with language indicating the fields had drowned out spots and were very clean with few weeds. *(AR, page 3600; XXXXX Exhibit M, page 258.)*

Adjuster1 (XXXXX) and AdjTrainee (XXXXX) did not provide photographs concerning the condition of the crops on Appellants' seven remaining FSNs. *(AR, pages 4918, 5555, & 5558; XXXXX Exhibit G, pages 1 – 21.)*

16. On July 28, 2017, Adjuster1 (XXXXX) completed a spreadsheet addressing precipitation from May 1, 2017, through June 30, 2017. In creating the spreadsheet, Adjuster1 (XXXXX) obtained the weather data for XXXXX, XXXXX. In addition to daily precipitation, the spreadsheet included 10-year average precipitation for the area and farming practice notes provided by Appellants. *(AR, pages 536 – 541, 3215 – 3222, 4242 – 4248, 5138 – 5144, 5387 – 5393, 5517 – 5523, 5898, & 7810; XXXXX Exhibit H, pages 1 – 2; HA, Trk 8, 52:00 – 53:20.)*

17. On July 28, 2017 (11:12am CT), Adjuster1 (XXXXX) emailed XXXXX (ClmsSupervisor (XXXXX)), a XXXXX Adjuster / Claims Supervisor. Adjuster1 (XXXXX) noted that he provided pictures of fields XXXXX staff inspected on Wednesday and CIMS data for Appellant1 (XXXXX) and Farmer1 (XXXXX). Further, Adjuster1 (XXXXX) confirmed that he had talked to Appellant1 (XXXXX), who agreed to fax Appellants' spray records. As attachments, Adjuster1 (XXXXX) provided the following:

- A Cover Sheet and photographs for Farmer1 (XXXXX) taken on July 26, 2017, to include the following:
  - Of FSN 5089, which included language which indicated the fields had drowned out spots and were very clean with few weeds. *(AR, page 3600; XXXXX Exhibit M, page 258.)*
  - Of FSN 3655, which included language indicating the fields had some drowned-out spots. In addition, some photographs noted that, as it appeared the sprayer missed the middle, the fields were very weedy with some clean spots. *(AR, pages 3574 – 3588, 3641 – 3655, 3807 – 3821, 3861 – 3875, & 6394 – 6408; XXXXX Exhibit M, pages 121 – 135.)*
- Photographs for Appellant1 (XXXXX) taken on July 26, 2017, to include the following:
  - Of FSN 5318, which included language indicating the fields had drowned out spots and were very clean with few weeds. *(AR, pages 3287 – 3289, 3367 – 3369, 3554 – 3556, & 3626 – 3628; XXXXX Exhibit M, pages 274 – 276.)*
  - Of FSN 2320,[10] which included language indicating the fields had drowned out spots and were very clean with few weeds. *(AR, pages 3290 – 3294, 3370 – 3374, 3486 – 3490, & 3629 – 3633; XXXXX Exhibit M, pages 277 – 281.)*
  - Of FSN 553, which included language indicating the fields had drowned out spots and were very clean with few weeds. In addition, some photographs noted that the fields had some stress spots due to moisture but were clean with few weeds. *(AR, pages 3295 – 3297, 3375 – 3377, 3468 – 3470, & 3634 – 3636; XXXXX Exhibit M, pages 282 – 284.)*
  - Of FSN 4920, with language indicating that the grass, which had been sprayed, was turning color and dying. *(AR, pages 3298 – 3301, 3378 – 3381, 3532 – 3535, & 3637 – 3640; XXXXX Exhibit M, pages 285 – 288.)*
- A July 28, 2017, CIMS Summary Report for Appellant1 (XXXXX) which confirmed CY 2017 burley tobacco in XXXXX County (66.76 acres), XXXXX County (111.10 acres), and XXXXX County (8.00 acres). XXXXX later confirmed this data through a CIMS Summary Report dated December 16, 2017. *(AR, pages 4297 – 4306, 4371 – 4380, 5115 – 5124, & 7575 – 7584; XXXXX Exhibit M, pages 289 – 297.)*
- A July 28, 2017, CIMS Summary Report for Farmer1 (XXXXX) which confirmed CY 2017 burley tobacco in XXXXX County (136.07 acres). XXXXX later confirmed this data through a CIMS Summary Report dated January 6, 2018. *(AR, pages 6422 – 6428; XXXXX Exhibit M, pages 298 – 304.)*

   *(AR, pages 3748 – 3750; XXXXX Exhibit I, page 4; XXXXX Exhibit M, pages 8 – 10.)*

18. XXXXX subsequently obtained a December 29, 2017, CIMS Summary Report for Appellant2 (XXXXX) which confirmed CY 2017 burley tobacco in XXXXX County (124.66 acres) and XXXXX County (0.00 acres). XXXXX later confirmed this data through a CIMS Summary Report dated January 6, 2018. *(AR, pages 5210 – 5237 & 8347 – 8374.)*

19. Later on July 28, 2017 (12:08 CT, 1:08pm ET), ClmsSupervisor (XXXXX) emailed XXXXX (VP/ClmsMngr (XXXXX)), a XXXXX Assistant Vice President / Claims Manager, including several pictures they had discussed. He indicated the pictures seem to reflect excessive amounts of grass. Further, he confirmed that XXXXX had requested spray records, which Appellants should provide by Monday. As attachments, ClmsSupervisor (XXXXX) included the documents provided by Adjuster1 (XXXXX) with his July 28, 2017, email.[11] *(AR, pages 3748 – 3750; XXXXX Exhibit I, page 4; XXXXX Exhibit M, pages 8 – 10.)*

20. On July 28, 2017 (12:25pm CT), VP/ClmsMngr (XXXXX) emailed ClmsSupervisor (XXXXX) indicating that Appellants needed to document comparable farms in area. VP/ClmsMngr (XXXXX) explained that this could help explain what may have caused excessive weed pressure. In noting that the tobacco looked yellow / burnt, he raised the question as to what could have caused this. VP/ClmsMngr (XXXXX) also raised the question as to whether this was a case of excessive moisture in the area causing issues and, as a result, the weeds got away from Appellants due to the moisture. VP/ClmsMngr (XXXXX) felt this could be explained by comparable fields in area. As attachments, VP/ClmsMngr (XXXXX) included:

- A six-page Summary of Co-Op Sales from 01/01/17 through 08/30/17. *(AR, pages 4284 – 4289, 4589 – 4594, 5181 – 5186, 5498 – 5503, 6011 – 6016, & 7966 – 7971; XXXXX Exhibit M, pages 50 – 55.)*
- A one-page Written Management Notes summary setting out chemicals sprayed on FSNs 2320, 553, and 5089. *(AR, pages 3466, 4291, 4596, 5188, 5505, 5919, 6920, & 7973; XXXXX Exhibit M, page 57.)*
- A one-page Written Management Notes summary combining the one-page Written Management Notes summary setting out chemicals sprayed on FSNs 2320, 553, and 5089, with the information on the last page of a three-page Written Management Notes summary addressing Appellant2 (XXXXX), Farmer1 (XXXXX), and chemicals sprayed by FSN. *(AR, pages 3212 – 3214, 3466, 3656 – 3657, 4281 – 4283, 4291, 4586 – 4588, 4596, 5178 – 5180, 5188, 5495 – 5497, 5505, 5897, 5909 – 5911, 5919, 6910 – 6912, 6920, 7809, 7963 – 7965, & 7973; Appellants' Exhibit D, pages 1 – 2; XXXXX Exhibit M, pages 47 – 49, 142, & 157.)*

Later on July 28, 2017 (12:37pm CT), ClmsSupervisor (XXXXX) forwarded VP/ClmsMngr (XXXXX)'s email to Adjuster1 (XXXXX). *(AR, pages 3748 – 3750; XXXXX Exhibit I, page 4; XXXXX Exhibit M, pages 8 – 10.)*

21. On July 30, 2017, Appelant1 (XXXXX) provided spray records to Adjuster1 (XXXXX). On July 31, 2017, Adjuster1 (XXXXX) emailed ClmsSupervisor (XXXXX), indicating that he was forwarding the spray and plow records Appellant1 (XXXXX) had provided. In noting that the farms had major grass issues, he pointed out that Appellants attempted to spray on June 7, 2017, but the sprayer got stuck three times. Further, Adjuster1 (XXXXX) noted that Appellants confirmed they never went back to spray these areas. As a result, Adjuster1 (XXXXX) asked that Appellants provide specific notes on what Appellants did on FSNs 3655 and 3777, and Appellant1 (XXXXX) indicated he would get back to him. As attachments, Adjuster1 (XXXXX) included the documents provided with VP/ClmsMngr (XXXXX)'s July 28, 2017, email.[12] *(AR, pages 3748 – 3750, 4918, 5555, & 5558; XXXXX Exhibit I, page 4; XXXXX Exhibit M, pages 8 – 10.)*

22. According to his contact logs, Adjuster1 (XXXXX) completed another field visit on August 1, 2017, with photographs of the following:

- For Appellant2 (XXXXX) of FSN 178, with language indicating the fields showed more weed pressure with the tobacco cut. In addition, the language indicated moisture might have stunted plants from the lower portion of the field and that grass was taking over. Finally, the language noted that the field had been plowed but not sprayed or chopped. *(AR, pages 3669 – 3683, 3709 – 3722, 3972 – 3974, 3981 – 3986, 4034 – 4048, & 7688 – 7702; XXXXX Exhibit M, pages 167 – 180.)*
- For Farmer1 (XXXXX) of FSN 3655 with language indicating the brackets showed clean rows and very weedy rows that had not been sprayed. *(AR, pages 3589 – 3592, 3741 –*

*3744, 3821 – 3825, 3876 – 3879, & 6409 – 6412; XXXXX Exhibit M, pages 136 – 139.)*

Adjuster1 (XXXXX) did not provide photographs concerning the condition of the crops on Appellants' 12 remaining FSNs. *(AR, page 4918, 5555, & 5558; XXXXX Exhibit G, pages 1 – 21.)*

23. On August 1, 2017, Adjuster1 (XXXXX) issued a Special Report to Farmer1 (XXXXX) for FSN 5089. The report indicated that Farmer1 (XXXXX) cut all marketable tobacco and that XXXXX released the stubble. *(AR pages 3746, 4918, & 6381.)*

24. On August 1, 2017, Adjuster1 (XXXXX) issued a Special Report to Appellant2 (XXXXX) for FSN 178-662, confirming Appellant2 (XXXXX) had cut all harvestable tobacco and that XXXXX released the stubble. The report noted that weed pressure from broad leaf weeds seemed high. Further, the report noted that 10 to 20 percent of the fields appeared drowned out, with either small or no tobacco remaining to harvest. *(AR, pages 3747, 5555, & 8544.)*

25. On August 2, 2017, Adjuster1 (XXXXX) emailed ClmsSupervisor (XXXXX), forwarding the pictures and information Adjuster1 (XXXXX) had on the XXXXX policies to date. As attachments, Adjuster1 (XXXXX) included:

- A Cover Sheet and photographs for Farmer1 (XXXXX), to include the following:
  o Of FSN 3655 taken on July 26, 2017. The photographs included language indicating the fields had some drowned out spots and that the fields were very weedy with some very clean spots. In addition, some photographs noted that the insured got stuck three times and quit spraying.[13] *(AR, pages 3574 – 3588, 3641 – 3655, 3807 – 3821, 3861 – 3875, & 6394 – 6408; XXXXX Exhibit M, pages 121 – 135.)*
  o Of FSN 3655 taken on August 1, 2017. The photographs included language indicating the brackets showed clean spots and very weedy areas which had not been sprayed. *(AR, pages 3589 – 3592, 3741 – 3744, 3822 – 3825, 3876 – 3879, & 3367 – 3369; XXXXX Exhibit M, pages 136 – 139.)*
- Two Tobacco Appraisals for FSN 3655. Option 1 reflected 1016 pounds per acre based on 10.7 leaves per stalk, while option two reflected 1612 pounds per acre based on 16.7 leaves per stalk. *(AR, pages 3667, 3745, 5896, & 7667; XXXXX Exhibit M, pages 140 & 155.)*
- Tobacco Appraisal Field Notes for FSN 3655. *(AR, pages 3668, 5896, & 7668; XXXXX Exhibit M, pages 141 & 156.)*
- A one-page Written Management Notes summary combining the one-page Written Management Notes summary setting out chemicals sprayed on FSNs 2320, 553, and 5089[14] with the information on the last page of a three-page Written Management Notes summary addressing Appellant2 (XXXXX), Farmer1 (XXXXX), and chemicals sprayed by FSN.[15] *(AR, pages 3656 – 3657, 5897, & 7809; Appellants' Exhibit D, pages 1 – 2; XXXXX Exhibit M, pages 142 & 157.)*
- Adjuster1 (XXXXX) Narrative covering July 28, 2017; July 31, 2017; and August 2, 2017; with supporting documents. Adjuster1 (XXXXX) noted that in reference to FSNs 3655 & 3777, Appellants stated they got the sprayer stuck three times and that when the fields were dry, it was too close to harvest to spray. In short, Appellants never sprayed FSNs 3655 and 3777 with Fusilade DX or hand-hoed / chopped weeds. In comparison, Appellants confirmed that they sprayed and plowed FSN 178, which had far less weeds then FSN 3655. Adjuster1 (XXXXX) noted that FSN 3655 was nearby to FSN 178 and had similar set dates. Adjuster1 (XXXXX) further noted Appellants reported spraying FSNs 3410 and

966, which are 5.5 miles southeast of FSN 3655, just two days after getting stuck on FSN 3655. Finally, Adjuster1 (XXXXX) noted that that FSN 3410 is a flat bottom field near a creek; thus, it should have taken longer to dry than FSN 3655 based on the topography map and the map setting out distances between FSNs. *(AR, pages 3461 – 3465, 3656 – 3666, 5988, & 7683; XXXXX Exhibit M, pages 143 & 158; HA, Trk 8, 1:02:40 – 1:04:00.)*

- Photographs for Appellant2 (XXXXX) of FSN 178-662-6 and of FSN 103[16] taken on July 7, 2017, and July 21, 2017. *(AR, pages 3462 – 3465, 3659 – 3662, 7684 – 7687; XXXXX Exhibit M, pages 144 – 147 & 159 – 162.)*

- Topographic Map for Farmer1 (XXXXX) for FSN 3655 with adjuster noting that the high slopping ground would be the area first to dry after rain. *(AR, pages 3663, 5943, & 8646; XXXXX Exhibit M, page 148.)*

- Topographic Map for Farmer1 (XXXXX) for FSN 966/3410 with adjuster noting that the low-lying area, which borders a creek, would be among the last to dry. *(AR, pages 3664, 5944, 7677, 8647, & 8651; XXXXX Exhibit M, pages 149 & 164.)*

- Topographic Map for Appellant2 (XXXXX) for FSN 178. *(AR, pages 3665, 5945, 7678, 8648, & 8652; XXXXX Exhibit M, pages 150 & 165.)*

- Topographic Map for Appellant2 (XXXXX) for FSN 3777[17] noting that the sloping ground should be among the first to dry. *(AR, pages 7676 & 8650; XXXXX Exhibit M, page 163.)*

- A map reflecting the distances between FSNs 178, 966, 3410, and 3655. *(AR, pages 3666, 5946, 7679, 8649, & 8683; XXXXX Exhibit M, pages 151 & 166.)*

- Photographs for Appellant2 (XXXXX) of FSN 3777[18] taken on July 21, 2017. *(AR, pages 3280 – 3281, 3452 – 3453, 3459 – 3460, 5103 – 5104, 5383 – 5384, & 7681 – 7682; XXXXX Exhibit M, pages 153 – 154.)*

- Photographs for Appellant2 (XXXXX) of FSN 178 taken on August 1, 2017. *(AR, pages 3670 – 3683, 3709 – 3722, 3973 – 3986, 4035 – 4048, & 7689 – 7702; XXXXX Exhibit M, pages 167 – 180.)*

- The 2015 – 2016 Burley & Dark Tobacco Guide. *(XXXXX Exhibit M, pages 181 – 256.)*

*(AR, pages 3748 – 3750; XXXXX Exhibit I, page 4; XXXXX Exhibit M, pages 8 – 10.)*

26. On August 3, 2017, ClmsSupervisor (XXXXX) emailed VP/ClmsMngr (XXXXX) noting that the email contained everything XXXXX had on Farmer1 (XXXXX) and Appellant2 (XXXXX)'s claims. ClmsSupervisor (XXXXX) went on to note that in the past two weeks he had looked at around 500 acres of tobacco for other policyholders, which did not have as many weeds. ClmsSupervisor (XXXXX) did not document the acres he relied on in making this comparison. Further, RMA acknowledged that it had no idea as to what 500 acres ClmsSupervisor (XXXXX) relied on as the Agency could find no reference in XXXXX's documentation of the claims. While acknowledging that XXXXX has the obligation to document its decision, XXXXX's representative pointed out that there is no specific requirement that XXXXX identify the acres ClmsSupervisor (XXXXX) referenced. As attachments, ClmsSupervisor (XXXXX) included the documents Adjuster1 (XXXXX) forwarded on August 2, 2017.[19] *(AR, pages 3748 – 3750; XXXXX Exhibit I, page 4; XXXXX Exhibit M, pages 8 – 10; HA, Trk 8, 1:02:40 – 1:04:00.)*

27. On August 8, 2017, Adjuster1 (XXXXX) issued a Special Report to Appellant2 (XXXXX) for FSN 3777. The report noted that the field showed extremely heavy grass and weed pressure. Further, it noted that Appellant2 (XXXXX) had cut all harvestable tobacco and that XXXXX had released the stubble. *(AR, pages 3765 & 8546.)*

28. On August 11, 2017, AdjTrainee (XXXXX) completed another field visit for Appellant2 (XXXXX) with photographs of the following:

- Of FSN 9. *(AR, pages 3266 – 3270, 5089 – 5093, & 5369 – 5373.)*
- Of FSN 178. *(AR, pages 3272, 3275 – 3278, 3454 – 3455, 3462 – 3463, 3968 – 3969, 4030 – 4031, 5095, 5098 – 5101, 5375, 5378 – 5381, & 7684 – 7685.)*

AdjTrainee (XXXXX) did not provide photographs concerning the condition of the crops on Appellant2 (XXXXX)'s three remaining FSNs. *(AR, page 5238; XXXXX Exhibit G, pages 1 – 21.)*

29. According to his contact logs, Adjuster1 (XXXXX) and AdjTrainee (XXXXX) completed another field visit on August 16, 2017, for Farmer1 (XXXXX) with photographs of the following:

- Of cut tobacco and stubble for FSN 966. *(AR, pages 3767 – 3769, 3792 – 3796, 3846 – 3850, 3900 – 3904, & 5951 – 5955.)*
- Of cut tobacco and stubble for FSN 3410. *(AR, pages 3776 – 3785, 3797 – 3806, 3851 – 3860, 3905 – 3914, & 5956 – 5965.)*

Adjuster1 (XXXXX) did not provide photographs concerning the condition of the crops on Appellants' 12 remaining FSNs. However, Adjuster1 (XXXXX) and AdjTrainee (XXXXX) did visit FSN 3655 and use a Global Positioning System (GPS) to determine the weed-free areas on FSN 3655 only. *(AR, pages 3776, 5555, 5558, & 5942; XXXXX Exhibit G, pages 1 – 21.)*

30. On August 16, 2017, Adjuster1 (XXXXX) issued Special Reports for Farmer1 (XXXXX) for the following:

- For FSN 966, indicating that Farmer1 (XXXXX) had harvested all marketable tobacco. While the report indicated that the field was mostly clean of large weeds, it noted that it did have more than normal weeds in areas due to tobacco being drowned out. Finally, the report noted that XXXXX released the stubble.
- For FSN 3410, indicating that Farmer1 (XXXXX) had harvested all marketable tobacco. While the report indicated that the field was mostly clean of large weeds, it noted that it did have more than normal weeds in areas due to tobacco being drowned out. Finally, the report noted that XXXXX released the stubble.
- For FSN 3655-647, indicating that Farmer1 (XXXXX) had harvested all marketable tobacco. Further, the report noted that the field was extremely weedy with only a few areas of clean weed-free stubble. In support of this statement, Adjuster1 (XXXXX), working with AdjTrainee (XXXXX), used a GPS on August 16, 2017, to determine that the weed-free areas in FSN 3655-647 totaled 4.5375 acres out of 53.35 acres. Finally, the report noted that XXXXX released the stubble.

While XXXXX adjusters used a GPS to delineate weed-free areas on FSN 3655-647, they did not use a GPS to delineate the drowned out areas on FSNs 966 or 3410. *(AR, pages 3766, 3915 – 3917, 5942, & 6378 – 6380.)*

31. According to her contact log, AdjTrainee (XXXXX) and Adjuster1 (XXXXX) completed additional field visits on August 22, 2017, and August 29, 2017. While AdjTrainee (XXXXX) and Adjuster1 (XXXXX) provided no photographs from the August 22, 2017, visit; they provided the following photographs from the August 29, 2017, visit:

- For Appellant1 (XXXXX) of FSN 4920. *(AR, pages 3328 – 3334, 3408 – 3414, 3531, 3535 – 3541, 4092 – 4098, 4930 – 4936, & 7125 – 7131.)*
- For Appellant2 (XXXXX) of FSN 9. *(AR, pages 3918 – 3923, 3946 – 3951, 4008 – 4013, 4070 – 4075, & 7721 – 7726.)*
- For Appellant2 (XXXXX) of FSN 103. *(AR, pages 3928 – 3931, 3954 – 3957, 4016 – 4019, 4078 – 4081, & 7729 – 7732.)*
- For Apellanr2 (XXXXX) of FSN 178. *(AR, pages 3684 – 3693, 3723 – 3732, 3987 – 3996, 4049 – 4058, & 7703 – 7712.)*

AdjTrainee (XXXXX) and Adjuster1 did not provide photographs concerning the condition of the crops on Appellants' ten remaining FSNs. *(AR, page 5238; XXXXX Exhibit G, pages 1 – 21.)*

32. On August 24, 2017, XXXXX sent letters to Appellant2 (XXXXX) and Farmer1 (XXXXX) requesting additional information, such as receipts, farm records, Third Party verifications, and other documents in support of their burley tobacco loss claims. XXXXX gave the parties 30 days to submit the additional information. On the same date, VP/ClmsMngr (XXXXX) emailed ClmsSupervisor (XXXXX) and Adjuster1 (XXXXX) advising them that the Request For Information letters had been sent to Appellant2 (XXXXX) and Farmer1 (XXXXX). *(AR, pages 62 – 66, 4419 – 4423, 6413 – 6417, 6420 – 6421, 7617 – 7621, 7844 – 7849, & 8337 – 8338; XXXXX Exhibit B, pages 1 – 2; XXXXX Exhibit C, pages 1 – 2; XXXXX Exhibit I, page 4; XXXXX Exhibit M, pages 2 – 6; XXXXX Post-Hearing Exhibit A, pages 2 – 3; XXXXX Post-Hearing Exhibit B, pages 4 – 5; HA, Trk 9, 31:06 – 31:30.)*

33. According to his contact logs, Adjuster1 (XXXXX) completed another field visit on September 8, 2017, with photographs of the following:

- For Appellant1 (XXXXX) of the stubble inspection for FSN 5318. *(AR, pages 3344 – 3356, 3424 – 3436, 3553, 3557 – 3568, 3752 – 3764, 4128 – 4140, 4207 – 4219, 4946 – 4958, & 7141 – 7153.)*
- For Appellant2 (XXXXX) of FSN 103. *(AR, pages 3932 – 3936, 3958 – 3963, 4020 – 4024, 4082 – 4086, & 7773 – 7737.)*
- For Appellant2 (XXXXX) of FSN 178. *(AR, pages 3694 – 3696, 3733 – 3735, 3997 – 3999, 4059 – 4061, & 7713 – 7715.)*
- For Farmer1 (XXXXX) of FSN 5089, with language indicating the presence of some wind damage and some grass and weeds. *(AR, pages 3601 – 3609, 3827 – 3835, 3881 – 3889, 4109 – 4117, & 5967 – 5975.)*

Adjuster1 (XXXXX) did not provide photographs concerning the condition of the crops on Appellants' 10 remaining FSNs. *(AR, pages 4918 & 5556; XXXXX Exhibit G, pages 1 – 21.)*

34. On September 8, 2017, Adjuster1 (XXXXX) issued a Special Report to Appellant1 (XXXXX) for FSN 5318. The report indicated that the fields were very weedy, with both broadleaf and grasses. Further, the report noted that Appellant1 (XXXXX) had cut all harvestable tobacco and that XXXXX released the stubble. As part of the report, Adjuster1 (XXXXX) attached an ID Page and photographs of the stubble inspection for FSN 5318 taken on September 8, 2017. *(AR, pages 3344 – 3356, 3751 – 3764, 4206 – 4219, 4412, & 7623.)*

35. On September 14, 2017, XXXXX completed 2017 Tobacco Appraisal Worksheets for Appellant2 (XXXXX) reflecting the following:

| FSN / Acres | Plants per acre | Avg Percent Plant Loss | Avg Leaves per Stalk | Appraised Lbs per acre |
|---|---|---|---|---|
| 800-61 / .96 ac | 6,789 | 22.7 | 10.7 | 934 |
| 3777 / 3.30 ac | 6,789 | 41.0 | 16.1 | 1,111 |
| 103-663 / 23.97 ac | 6,789 | 30.8 | 5.5 | 436 |
| 103-663 / 2.15 ac | 6,789 | 19.7 | 5.0 | 452 |
| 103-663 / 4.73 ac | 6,789 | 19.0 | 4.3 | 391 |
| 9-93 / 4.00 ac *See Note 1* | 6,789 | 56.0 | 4.1 | 251 |
| 178-662 / 34.01 ac | 6,789 | 14.0 | 9.1 | 874 |
| 178-662 / 11.75 ac | 6,789 | 34.8 | 4.2 | 316 |
| 178-662 / .99 ac | 6,789 | 38.3 | 3.8 | 272 |
| 178-662 / 6.34 ac | 6,789 | 28.7 | 5.4 | 439 |
| 178 / 12.80 ac | 6,789 | 32.8 | 17.2 | 1,328 |
| 178-662 / 4.30 ac | Missing | 30.3 | 16.8 | 1,339 |
| 178 / 10.0 ac | 6,789 | 29.8 | 17.0 | 1,363 |

*Note 1 – XXXXX was unable to explain why the test sheet was missing for this field. (XXXXX Exhibit N, pages 2 – 3.)*

*(AR, pages 4144 – 4168 & 5241 – 5265.)*

36. On September 14, 2017, XXXXX (ExtAgent (XXXXX)), the XXXXX County University of XXXXX Extension Agent, submitted a letter to XXXXX concerning weed control measures for CY 2017 burley tobacco in XXXXX. ExtAgent (XXXXX), who provided the letter at Appellants' request, noted that such measures can be found in the "2017 Weed Control Manual for XXXXX" and the "2017-2018 Burley & Dark Tobacco Production Guide." Among other things, ExtAgent (XXXXX) noted that the publications recommended "using herbicides in accordance with their label." ExtAgent (XXXXX) went on to note that the summer of 2017 had "been wet with lots of small local showers and frequent rain." Finally, ExtAgent (XXXXX) noted that "[f]requent rains often lead to more germination events for weeds and can reduce the residual efficacy of the pre-emergent herbicides traditionally used in tobacco." *(AR, pages 4180, 4249, 4573, 5146, 5409, 6127, 7627, & 8132; XXXXX Exhibit M, pages 15, 63, & 118; XXXXX Post-Hearing Exhibit A, pages 2 – 3; XXXXX Post-Hearing Exhibit B, pages 4 – 5; HA, Trk 9, 32:55 – 35:10.)*

37. According to her contact log, AdjTrainee (XXXXX) made another farm visit on September 14, 2017. AdjTrainee provided no photographs demonstrating the condition of Appellants' crops from this visit. *(AR, page 5238.)*

38. On September 15, 2017, AdjTrainee (XXXXX) sent two emails to Adjuster1 (XXXXX) with a series of documents she obtained regarding Appellants' claims, to include:

- With the first email (9:46am), AdjTrainee (XXXXX) included:
  - A copy of ExtAgent (XXXXX)'s September 14, 2017, letter. *(AR, pages 4180, 4249, 4573, 5146, 5409, 6127, 7627, & 8132; XXXXX Exhibit M, pages 15, 63, & 118.)*
  - A three-page Written Growing Season Management Summary for Appellant2 (XXXXX) setting out Tobacco Variety, Setter Water, Chemicals, and Spraying notes. *(AR, pages 5410 – 5412, 8212 – 8214, & 8657 – 8659; XXXXX Exhibit M, pages 64 – 66.)*
  - Co-Op Fertilizer Input Receipts. *(AR, pages 8215 – 8222; XXXXX Exhibit M, pages 67 – 74.)*

- o Copies of the Employee ID cards for the 27 H2A migrant workers Appellants employed for CY 2017. *(AR, pages 4891 – 4917, 5613 – 5641, 6100 – 6126, 7590 – 7616, & 8142 – 8168; XXXXX Exhibit M, pages 75 – 101.)*
- o Billing Statement from XXXXX, setting out costs Appellants owed for the transportation of their migrant workers. *(AR, pages 4358, 6712, 5642 – 5666, 5670 – 5671, 6960, & 8224; XXXXX Exhibit M, page 102.)*
- o Co-Op Fertilizer Input Receipts. *(6697 – 6708; XXXXX Exhibit M, pages 103 – 114.)*
- o A three-page Growing Season Management Summary for Farmer1 (XXXXX) setting out Tobacco Variety, Setter Water, Chemicals, and Spraying notes. *(AR, pages 6709 – 6711 & 8654 – 8656; XXXXX Exhibit M, pages 115 – 117.)*

- • With the second email (9:55am), AdjTrainee (XXXXX) included:
  - o Another copy of ExtAgent (XXXXX)'s September 14, 2017, letter. *(AR, pages 4180, 4249, 4573, 5146, 5409, 6127, 7627, & 8132; XXXXX Exhibit M, pages 15, 63, & 118.)*
  - o Co-Op Fertilizer Input Receipts. *(AR, pages 4250 – 4262, 4597 – 4609, 5147 – 5159, 5413 – 5420, & 6921 – 6933; XXXXX Exhibit M, pages 16 – 28.)*
  - o A three-page Written Growing Season Management Summary for Appellant1 (XXXXX) setting out Tobacco Variety, Setter Water, Chemicals, and Spraying notes. *(AR, pages 3225 – 3227, 4263 – 4265, 4610 – 4612, 5160 – 5162, & 6934 – 6936; XXXXX Exhibit M, pages 29 – 31.)*
  - o A six-page Summary of Co-Op Billing Envelopes and notes on payments. *(AR, pages 4266 – 4271, 4923 – 4928, 5163 – 5168, 5480 – 5485, 6892 – 6897, & 7948 – 7953; XXXXX Exhibit M, pages 32 – 37.)*
  - o A five-page Co-Op Invoice Listing covering the period from November 15, 2016, through April 5, 2017. *(AR, pages 4272 – 4276, 4577 – 4581, 5169 – 5173, 5486 – 5490, 6017 – 6021, 6901 – 6905, 6913 – 6916, 6918, & 7954 – 7958; XXXXX Exhibit M, pages 38 – 42.)*
  - o A four-page summary of XXXXX Input Receipts. *(AR, pages 4277 – 4280, 5174 – 5177, 5491 – 5494, 5989 – 5990, 6022 – 6023, 6906 – 6909, & 7959 – 7962; XXXXX Exhibit M, pages 43 – 46.)*
  - o A three-page Written Management Notes summary provided by Appellants addressing Appellant2 (XXXXX), Farmer1 (XXXXX), and chemicals sprayed by FSN. *(AR, pages 3212 – 3214, 4281 – 4283, 4586 – 4588, 5178 – 5180, 5495 – 5497, 5909 – 5911, 6910 – 6912, & 7963 – 7965; XXXXX Exhibit M, pages 47 – 49.)*
  - o A six-page Summary of Co-Op Sales from January 1, 2017, through August 30, 2017. *(AR, pages 4284 – 4289, 4589 – 4594, 5181 – 5186, 5498 – 5503, 6011 – 6016, & 7966 – 7971; XXXXX Exhibit M, pages 50 – 55.)*
  - o A copy of a XXXXX receipt reflecting payment on May 12, 2017. *(AR, pages 4290, 4595, 5187, 5504, 5918, 6919, & 7972; XXXXX Exhibit M, page 56.)*
  - o A one-page Written Management Notes summary setting out chemicals sprayed on FSNs 2320, 553, and 5089. *(AR, pages 3466, 4291, 4596, 5188, 5505, 5919, 6920, & 7973; XXXXX Exhibit M, page 57.)*
  - o National Weather Service (NWS) Weather Data for May and June of 2017. *(AR, pages 3283 – 3286, 4292 – 4295, 4381 – 4384, 5189 – 5192, 5506 – 5509, 5905 – 5908, 7411 – 7414, 7976 – 7977; XXXXX Exhibit N, pages 1 & 4 – 7; XXXXX Exhibit M, pages 58 – 61.)*

*(AR, pages 4918, 5556, & 5559; XXXXX Exhibit M, pages 14 – 117.)*

39. On September 19, 2017, Adjuster1 (XXXXX) emailed VP/ClmsMngr (XXXXX) with a copy to ClmsSupervisor (XXXXX) and AdjTrainee (XXXXX). As attachments, Adjuster1 (XXXXX)

included AdjTrainee (XXXXX)'s September 15, 2017, emails with attachments. On September 20, 2017, VP/ClmsMngr (XXXXX) forwarded the email and attachments to XXXXX (VPresClaims (XXXXX)), a XXXXX Assistant Vice President for Claims. *(AR, pages 62 – 66, 4419 – 4423, 5559, 6413 – 6417, 7617 – 7621, & 7844 – 7849; XXXXX Exhibit I, pages 1 – 4; XXXXX Exhibit M, pages 2 – 6 & 14 – 118.)*

40. On September 29, 2017, VPresClaims (XXXXX) emailed VP/ClmsMngr (XXXXX), with copies to ClmsSupervisor (XXXXX) and Adjuster1 (XXXXX), indicating that XXXXX should plan a call when all were available to discuss the claims. VPresClaims (XXXXX) noted that he thought that the next step was to identify an expert in order to make determinations as to the propriety of the farming practices Appellants used, to include the herbicides they used. In addition, XXXXX needed to establish the GFP in Appellants' area. VPresClaims (XXXXX) noted that if XXXXX cannot find an expert then the AIP would need to do its own comparison of Appellants' practices to the Weed Control Manual referenced by the extension agent. Finally, VPresClaims (XXXXX) noted that Appellants' expert did not provide details concerning Appellants' operation. *(AR, pages 62 – 66, 4419 – 4423, 6413 – 6417, 7617 – 7621, & 7844 – 7849; XXXXX Exhibit I, pages 1 – 4; XXXXX Exhibit M, pages 2 – 6.)*

41. In light of the Growing Season Management Summaries Appellants provided, XXXXX obtained and reviewed Label and Product Information on the following chemicals:

- Fusilade DX, a post-emergent herbicide used to control grass. *(AR, pages 4424 – 4464, 5431 – 5469, 6059 – 6097, 7628 – 7666, 7756 – 7794, & 8604 – 8642.)*
- Spartan 4F, a herbicide. *(AR, pages 4731 – 4747, 5394 – 5407, 6024 – 6037, 7353 – 7366, & 8500 – 8513.)*
- Devrinol 2-EC, a pre-emergent herbicide. *(AR, pages 4746 – 4748, 5277 – 5279, 6596 – 6598, 7193 – 7195, & 8514 – 8516.)*

42. In analyzing the management practices Appellants used with their CY 2017 burley tobacco, XXXXX obtained and reviewed the following documents:

- The 2017 Weed Control Manual for XXXXX, issued by the XXXXX Extension Service. *(AR, pages 4463 – 4572, 6443 – 6552, 6970 – 7079, 82225 – 8334, & 9081 – 9087 (Excerpts)).*
- The Burley and Dark Tobacco Guide; issued jointly by the University of XXXXX, the University of XXXXX, XXXXX, and XXXXX State University; for the following CYs:
  ○ 2015 – 2016 *(XXXXX Exhibit M, pages 181 – 256)*
  ○ 2017 – 2018, which included one sentence (at AR page 12535) that references hand-hoeing or chopping. Specifically, the sentence notes that "[f]ield cultivation and hand-hoeing are also traditional methods to maintain weed control post-transplant, but effective herbicide control options decrease the need for mechanical control methods." *(AR, pages 4614 – 4688, 5280 – 5355, 6128 – 6203, 7490 – 7565, 7865 – 7940, Excerpts (Exc) 8833 – 8837, 11448 – 11523, & 12508 – 12583; XXXXX Post-Hearing Exhibit B, pages 4 – 5 & 16 – 17.)*
- Excerpts or slides from the 2017 – 2018 Burley and Dark Tobacco Guide. *(AR, pages 5986 – 5987, 7669 – 7671, 7673 – 7674, & 7746.)*
- The 2014 – 2015 Lime and Nutrient Recommendations, Number AGR-1, produced by the University of XXXXX. *(AR, pages 4689 – 4712, 6352 – 6375, 7466 – 7489, & 8517 – 8540.)*
- Liming and Fertilizing Burley Tobacco, Number AGR-49, issued by the University of XXXXX. *(AR, pages 4713 – 4721, 5471 – 5479, 5991 – 5999, 7457 – 74365, & 7851 –*

*7859.)*

- Chapter II (Agronomic Crops), Lime and Fertilizer Recommendations for Various Crops of XXXXX, BESS Info # 100, issued by the University of XXXXX Institute of Agriculture. *(AR, pages 4722 – 4730, 5266 – 5274, 5422 – 5430, 6043 – 6051, 6599 – 6607, 7439 – 7447, 7448 – 7456, 7747 – 7755, 7795 – 7803, & 8959 – 8970; XXXXX Exhibit O, page 1.)*
- An article on the use of Potassium Chloride in Nutrient Source Specifics, issued by International Plant Nutrition Institute (IPNI). *(AR, pages 4745, 5470, 6058, 7192, & 7804.)*
- An article/report on Burley and Dark Tobacco Weed Control. *(AR, pages 5899 – 5904.)* *App/XXXXX – source of this article*

43. On October 5, 2017, RMA's Southern Regional Compliance Office (SRCO) sent a letter to XXXXX advising the AIP that SRCO had received a Spot Check Form AD-2027 from the XXXXX State Farm Service Agency (FSA) Office concerning Appellant1 (XXXXX)'s burley tobacco on FSN 2320, Tract 965. During its first visit on July 19, 2017, FSA found that "the crop was below average and needed to [sic] plowed and fertilized." During its second visit on August 30, 2017, FSA found that "the crop seemed to have disease, as well as problems with weeds." As attachments, the SRCO included:

    - An AD-2045 FSA County Office GPS Data Log dated July 19, 2017, prepared by an FSA Program Tech.
    - Photographs of FSN 2320, Tract 965, taken by FSA on July 19, 2017.
    - An AD-2045 FSA County Office GPS Data Log dated August 30, 2017, prepared by an FSA Program Tech.
    - Photographs of FSN 2320, Tract 965, taken by FSA on August 30, 2017.

    *(AR, pages 16 – 37, 3504 – 3525, 4181 – 4201, 4387 – 4399, & 7082 – 7105.)*

44. On October 9, 2017, VP/ClmsMngr (XXXXX) emailed VPresClaims, (XXXXX) with copies to ClmsSupervisor (XXXXX) and Adjuster1 (XXXXX). In follow-up to a phone conference, VP/ClmsMngr (XXXXX) noted that once Adjuster1 (XXXXX) returned from military leave, he and ClmsSupervisor (XXXXX) needed to review the information XXXXX had on the claims. As part of this review, VP/ClmsMngr (XXXXX) indicated that they should outline each policy, start to finish, detailing conditions and relating the practices to the publications or the opinion of an agricultural expert. If possible, they should discuss with the expert whether the chemicals Appellants used were labeled for tobacco. In addition, VP/ClmsMngr (XXXXX) felt the review should evaluate XXXXX appraisals as they relate to surrounding fields. Finally, VP/ClmsMngr (XXXXX) noted that they should reschedule a call in November to discuss the claims. *(AR, pages 62 – 66, 4419 – 4423, 6413 – 6417, 7617 – 7621, & 7844 – 7849; XXXXX Exhibit I, pages 1 – 4; XXXXX Exhibit M, pages 2 – 6.)*

45. On October 11, 2017, ClmsSupervisor (XXXXX) issued the following Special Reports to Appellant1 (XXXXX):

    - For FSN 4920, the report indicated that the farm had excessive grass and weeds in all fields. The report noted that Appellant1 (XXXXX) appeared to have harvested all marketable tobacco and that XXXXX released the stubble.
    - For FSN 2320, the report indicated that Appellant1 (XXXXX) had harvested all marketable tobacco. Although the report noted that there were some heavy weeds in areas of the fields, it did not specify how much of the field was weedy. Finally, the report noted that XXXXX released the stubble.

- For FSN 553, the report indicated Appellant1 (XXXXX) had harvested all marketable tobacco. While the report noted that some areas appeared to have excessive weeds, it did not indicate how much of the field was weedy. Finally, the report noted that XXXXX released the stubble.

While XXXXX adjusters used a GPS to delineate weed-free areas on FSN 3655-647 for Farmer1 (XXXXX), they did not use a GPS to establish the weedy areas on FSNs 553 or 2320. *(AR, pages 4411, 4413 – 4414, 5002 – 5004, 7622, & 7624 – 7625.)*

46. On October 11, 2017, ClmsSupervisor (XXXXX) issued the following Special Reports to Appellant2 (XXXXX):

- For FSN 009, the report indicated the presence of excessive grass and broadleaf weeds across the entire field. The report also noted that Appellant 2 (XXXXX) had harvested all marketable tobacco and that XXXXX released the stubble.
- For FSN 103, the report indicated that the fields had excessive weeds in many areas. The report did not specify how much of the field was weedy. The report also noted that Appellant2 (XXXXX) had harvested all marketable tobacco and that XXXXX had released the stubble.
- For FSN 178, the report indicated excessive weeds in the fields. The report did not specify how much of the field was weedy. The report also noted that Appellant2 (XXXXX) had harvested all marketable tobacco and that XXXXX released the stubble.

Once again, while XXXXX adjusters used a GPS to delineate weed-free areas on FSN 3655-647 for Farmer1 (XXXXX), they did not use a GPS to establish the weedy areas on FSNs 103 or 178. *(AR, pages 5005 – 5007 & 8541 – 8543.)*

47. According to AdjTrainee (XXXXX)'s contact log and the photographs filed in the claims records, AdjTrainee XXXXX, Adjuster1 (XXXXX), and ClmsSupervisor (XXXXX), made farm visits on October 11, 2017, and October 12, 2017. XXXXX provided photographs dated October 11, 2017, of the following:

- For Appellant1 (XXXXX) of the stubble inspection for FSN 4920. One picture included language indicating the presence of grass and weeds. *(AR, pages 3335 – 3343, 3415 – 3423, 3542 – 3550, 4099 – 4107, 4937 – 4945, & 7132 – 7140.)*
- For Appellant1 (XXXXX) of the stubble inspection and hanging tobacco from FSN 5318. *(AR, pages 3357 – 3359, 3437 – 3439, 3569 – 3571, 4141 – 4143, 4959 – 4961, & 7154 – 7156.)*
- For Appellant1 (XXXXX) of the stubble inspection and hanging tobacco from FSN 553. *(AR, pages 2764 – 2776, 3302 – 3311, 3382 – 3391, 3467, 3471 – 3479, 4220, 4313 – 4315, 4975 – 4987, 5204 – 5206, & 7170 – 7179.)*
- For Appellant1 (XXXXX) of the stubble inspection for FSN 2320. *(AR, pages 3324 – 3327, 3404 – 3407, 3499 – 3502, 4971 – 4974, 5030 – 5033, & 7166 – 7169.)*
- For Appellant2 (XXXXX) of the stubble inspection for FSN 9. *(AR, pages 3924 – 3925, 3952 – 3953, 4014 – 4015, 4076 – 4077, & 7727 – 7728.)*
- For Appellant2 (XXXXX) of the stubble inspection for FSN 103. *(AR, pages 3937 – 3941, 3963 – 3967, 4025 – 4029, 4087 – 4091, & 7738 – 7742.)*
- For Appellant2 (XXXXX) of the stubble inspection for FSN 178. *(AR, pages 3697 – 3701, 3736 – 3740, 4000 – 4004, 4062 – 4066, & 7716 – 7720.)*

AdjTrainee (XXXXX), Adjuster1 (XXXXX), and ClmsSupervisor (XXXXX), did not provide photographs concerning the condition of the crops on Appellants' 7 remaining FSNs. *(AR, page 5238; XXXXX Exhibit G, pages 1 – 21.)*

48. On October 13, 2017 (10:01am), ClmsSupervisor (XXXXX) emailed VP/ClmsMngr (XXXXX) and VPresClaims (XXXXX) with a copy to Adjuster1 (XXXXX). ClmsSupervisor (XXXXX) noted that after a phone call, Adjuster1 (XXXXX) got Appellant1 (XXXXX) to send a picture of the Fusilade DX label. ClmsSupervisor (XXXXX) further noted that according to the manufacturer, the chemical was not approved for use with tobacco. ClmsSupervisor (XXXXX) indicated that Appellants used the chemical on all farms except two where the sprayer got stuck. [20] ClmsSupervisor (XXXXX) noted that he had provided a link to the manufacturer's web site with his email. On the same date, VPresClaims (XXXXX) emailed ClmsSupervisor (XXXXX) and VP/ClmsMngr (XXXXX), with a copy to Adjuster1 (XXXXX), to advise them that the link to the manufacturer's web site had not come through. Later that day, ClmsSupervisor (XXXXX) replied by email, forwarding the link to the manufacturer's web site for the Fusilade DX label. *(AR, pages 62 – 66, 4419 – 4423, 5861 – 5864, 6413 – 6417, 7617 – 7621, 7844 – 7849, 8695 – 8698, & 9277 – 9278; XXXXX Exhibit I, pages 1 – 4; XXXXX Exhibit L, page 1; XXXXX Exhibit M, pages 2 – 6; XXXXX Post-Hearing Exhibit B, page 5.)*

49. In light of the response XXXXX provided concerning the use of Fusilade DX on burley tobacco, VPresClaims (XXXXX) sent an email on October 13, 2017 (10:55am) to ClmsSupervisor (XXXXX) and VP/ClmsMngr (XXXXX), with a copy to Adjuster1 (XXXXX). VPresClaims (XXXXX) indicated that "[w]e will ultimately assign uninsured causes up to the guarantee on all acres where they sprayed this chemical off label. For areas where they did not spray anything, we need the comparison of what the production/weed management guide said compared to what they actually did. We will also need to make the point that even if it were too wet to spray, which we question, there were still alternate means of weed control that should have been followed." As an attachment, VPresClaims (XXXXX) included the response from XXXXX stating that "Fusilade DX is not labeled for tobacco and therefore cannot be used." *(AR, pages 62 – 67, 4418 – 4423, 6413 – 6417, 7566, 7617 – 7621, 7807, & 7844 – 7849; XXXXX Exhibit I, pages 1 – 4; XXXXX Exhibit M, pages 2 – 6.)*

50. According to Adjuster1 (XXXXX)'s contact logs and the photographs filed in the claims records, Adjuster1 (XXXXX) and ClmsSupervisor (XXXXX) completed another field visit on October 18, 2017, with photographs of the following:

- For Appellant1 (XXXXX) hanging tobacco from FSNs 553 and 2320. *(AR, pages 3312 – 3314, 3392 – 3394, 3480 – 3482, 4222 – 4223, 4316, 4989 – 4994, & 7183 – 7189.)*
- For Appellant1 (XXXXX) of the stubble inspection for FSN 2320. *(AR, pages 3315 – 3323, 3395 – 3403, 3485, 3491 – 3498, 4308 – 4312, 4962 – 4970, 5021 – 5029, 5199 – 5201, & 7157 – 7165.)*
- For Appellant1 (XXXXX) of the stubble inspection and hanging tobacco from FSN 7359. *(AR, pages 3360 – 3366, 3440 – 3446, 4988 – 4994, 5009 – 5015, 5034 – 5040, & 7183 – 7189.)*
- For Appellant2 (XXXXX) of the stubble inspection for FSN 800. *(AR, pages 4006 – 4007, 4068 – 4069, 4998 – 4999, 5019 – 5020, & 7744 – 7745.)*
- For Farmer1 (XXXXX) of the stubble inspection for FSN 5089. *(AR, pages 3610 – 3619, 3836 – 3845, 3890 – 3899, 4188 – 4127, & 5976 – 5985.)*

Adjuster1 (XXXXX) did not provide photographs concerning the condition of the crops on Appellants' 10 remaining FSNs. *(AR, pages 4918 & 5559; XXXXX Exhibit G, pages 1 – 21.)*

51. On October 18, 2017, Adjuster1 (XXXXX) issued the following Special Reports:

- To Appellant1 (XXXXX), for FSN 7359, the report indicated both fields were weedy with both broadleaf weeds and grass. In the report, Adjuster1 (XXXXX) acknowledged that Field 7359-9877-1 did have some clean weed free spots. Further, the report noted that Appellant1 (XXXXX) had harvested all marketable tobacco and that XXXXX released the stubble.
- To Appellant2 (XXXXX), for FSN 800, the report indicated that the field had a little grass and weed pressure. The report also noted that the tobacco stalks showed significant wind damage. Finally, the report noted that Appellant2 (XXXXX) had harvested all marketable tobacco and that XXXXX released the stubble.
- To Farmer1 (XXXXX), for FSN 5089, the report indicated that the fields had some clean spots and some weedy spots with both broadleaf weeds and grass. The report also noted that Farmer1 (XXXXX) had not cut all plants but that the ones left standing had no marketable leaves on them. Finally, the report noted that XXXXX released the stubble.

While XXXXX adjusters used a GPS to delineate weed-free areas on FSN 3655-647 for Farmer1 (XXXXX), they did not use a GPS to establish the clean spots in FSNs 5089 or 7359. *(AR, pages 4415, 5008, 5041 – 5042, 6382, 7626, & 8545.)*

52. On October 23, 2017, ClmsSupervisor (XXXXX) emailed XXXXX (ComplianceRep (XXXXX)), an employee with XXXXX's compliance department. ClmsSupervisor (XXXXX) indicated that he had visited Appellant1 (XXXXX) on October 11, 2017, and that all farms had already been harvested prior to the compliance case being opened. Specifically, ClmsSupervisor (XXXXX) noted that Appellant1 (XXXXX) harvested FSN 5318 on September 8, 2017; and harvested FSNs 553 & 2320 the week of October 1, 2017. In addition, ClmsSupervisor (XXXXX) requested additional time to respond to the compliance department, as XXXXX was in the middle of a GFP determination and that it would be 40 to 45 days before the tobacco would be in barn ready for stripping. As attachments, ClmsSupervisor (XXXXX) included:

- Photographs for Appellant1 (XXXXX) of FSN 5318 taken on September 8, 2017. *(AR, pages 3345 – 3356, 3425 – 3436, 3557 – 3568, 3753 – 3764, 4129 – 4140, 4208 – 4219, 4947 – 4958, & 7142 – 7153; XXXXX Exhibit M, page 306.)*
- A copy of the September 8, 2017, Tobacco Special Report from Adjuster1 (XXXXX) to Appellant1 (XXXXX). *(AR, page 3751.)*
- Photographs of hanging tobacco from FSN 5318 taken on October 18, 2017. *(AR, pages 3358, 3438, 3570, 4142, 4960, & 7155.)*
- Photographs of hanging tobacco for Appellant1 (XXXXX) from FSNs 553 and 2320 taken on October 11, 2017. *(AR, pages 2775 – 2776.)*
- Photographs of XXXXX stubble inspections for FSNs 553 and 2320 taken on October 11, 2017. *(AR, pages 2768, 3326, 3406, 3501, 4973, 5032, & 7168.)*

ComplianceRep (XXXXX) advised RMA's SRCO that XXXXX had uploaded the above documents in response to SRCO's compliance case issued for Appellant1 (XXXXX). *(AR, pages 4204 & 4206 – 4224; XXXXX Exhibit I, page 4; XXXXX Exhibit M, page 12.)*

53. On October 25, 2017, VP/ClmsMngr (XXXXX) sent Appellant1 (XXXXX) a letter on behalf of XXXXX requesting additional information in support of his CY 2017 burley tobacco crop claim. XXXXX noted that the relevant information included, but was not limited to, receipts, farm records, Third Party verifications, and any other documentation to show that Appellant1

(XXXXX)'s farming practices were recognized Good Farming Practices. *(AR, pages 4317 – 4318 & 7120 – 7121; XXXXX Exhibit D, pages 1 – 2; XXXXX Post-Hearing Exhibit A, pages 2 – 3; XXXXX Post-Hearing Exhibit B, pages 4 – 5; HA, Trk 9, 31:30 – 32:55.)*

54. According to his contact logs, Adjuster1 (XXXXX) made farm visits on November 6, 2017, and November 16, 2017, to complete barn appraisals of Appellants' tobacco. *(AR, pages 4919, 5556, & 5559.)*

55. Based on the Growing Season Management Summaries Appellants provided, Adjuster1 (XXXXX) developed the following spreadsheets:

- For Appellant1 (XXXXX) *(AR, pages 543, 3224, 4241, 4574, 5137, 6898, & 11446)*:

| FSN/Tract | Field | Set Date | Preemergent Herbicide Application * See Note 1 | Application of Fusilade DX (16 ounces per acre) * See Note 2 | Date Plowed | Date Chopped / Side Dressed |
|---|---|---|---|---|---|---|
| 553/949 | 1 | 06/20/17 | 06/20/17 | 08/09/17 | 07/25 to 07/26/17 | |
| | 2 | 06/20/17 | 06/20/17 | 08/09/17 | 07/25 to 07/26/17 | |
| | 3 | 06/20/17 | 06/20/17 | 08/09/17 | 07/25 to 07/26/17 | |
| 2320/955 | 1 | 06/21/17 | 06/21/17 | 08/09/17 | 07/25 to 07/26/17 | |
| 2320/965 | 1 | 06/21/17 | 06/21/17 | 08/09/17 | 07/25 to 07/26/17 | |
| 4920/19541 | 3 | 06/17/17 | | 06/15 to 06/17/17 * See Note 3 | | |
| | 4 | 06/17/17 | | 06/15 to 06/17/17 * See Note 3 | | |
| | 5 | 06/17/17 | | 06/15 to 06/17/17 * See Note 3 | | |
| 5318/19723 | 2 | 06/03/17 | 06/20 & 06/27/17 | | 06/30 to 07/01/17 07/11 to 07/12/17 | Chopped 07/11 to 07/13/17 |
| | 4 | 06/03/17 | 06/20 & 06/27/17 | | 06/30 to 07/01/17 07/11 to 07/12/17 | Chopped 07/11 to 07/13/17 |
| | 7 | 06/03/17 4.8 acres | 06/20 & 06/27/17 | | 06/30 to 07/01/17 07/11 to 07/12/17 | Chopped 07/11 to 07/13/17 |

| FSN/Tract | Field | Set Date | Preemergent Herbicide Application | Application of Fusilade DX | Date Plowed | Date Chopped / Side Dressed |
|---|---|---|---|---|---|---|
| | 7 | 06/27/17 5.7 acres | 06/20 & 06/27/17 | | 06/30 to 07/01/17 07/11 to 07/12/17 | Chopped 07/11 to 07/13/17 |
| 7359/3292 | 1 | 06/27/17 | 06/27/17 | 08/03/17 | 08/03/17 | |
| 7359/9877 | 1 | 06/27/17 | 06/27/17 | 08/03/17 | 08/03/17 | |

- For Appellant2 (XXXXX) *(AR, pages 3223, 3225, 5356 (Revised), 8211, & 8223)*:

| FSN/Tract | Field | Set Date | Preemergent Herbicide Application * See Note 1 | Application of Fusilade DX (16 ounces per acre) * See Note 2 | Date Plowed | Date Chopped / Side Dressed |
|---|---|---|---|---|---|---|
| 9/93 | 1 | 06/18/17 | 06/17/17 | 06/17 to 06/18/17 | | |
| 103/663 | 1 | 06/15/17 | 06/15/17 | 08/03/17 | 06/17 to 06/21/17 | |
| 178/662 | 1 | 06/14/17 | 05/03 to 05/09/17 | 08/03/17 | 06/03 to 06/11/17 06/17 to 06/21/17 | |
| | 2 | 05/09/17 | 05/03 to 05/09/17 | | 06/03 to 06/11/17 06/17 to 06/21/17 | |
| | 4 | 05/09/17 | 05/03 to 05/09/17 | | 06/03 to 06/11/17 06/17 to 06/21/17 | |
| | 6 | 05/09/17 | 05/03 to 05/09/17 | | 06/03 to 06/11/17 06/17 to 06/21/17 | |
| | 8 | 05/09/17 | 05/03 to 05/09/17 | | 06/03 to 06/11/17 06/17 to 06/21/17 | |
| | 9 | 05/09/17 | 05/03 to 05/09/17 | | 06/03 to 06/11/17 06/17 to 06/21/17 | |
| | 10 | 05/09/17 | 5/03 to 05/09/17 | | 06/03 to 06/11/17 06/17 to 06/21/17 | |
| 800/61 | 1 | 06/27/17 | 06/27/17 | 08/03/17 | 07/27/17 | |
| 3777/625 | 1 | 05/15/17 | 05/18/17 | Portion on 06/07/17 | | |

- For Farmer1 (XXXXX) *(AR, pages 6713, & 11477)*:

| FSN/Tract | Field | Set Date | Preemergent Herbicide Application * See Note 1 | Application of Fusilade DX (16 ounces per acre) * See Note 2 | Date Plowed | Date Chopped / Side Dressed |
|---|---|---|---|---|---|---|
| 966/133 | 1 | 05/18/17 | 05/18 to 05/20/17 | | 06/09 to 06/10/17 | |
| 3410/126 | 1 | 05/20/17 | 05/18 to 05/20/17 | | 06/09 to 06/10/17 | |
| 3655/647 | 1 | 05/11/17 | 05/09 to 05/11/17 | Portion on 06/07/17 | | |
| | 2 | 05/11/17 | 05/09 to 05/11/17 | Portion on 06/07/17 | | |
| | 3 | 05/11/17 | 05/09 to 05/11/17 | Portion on 06/07/17 | | |
| | 4 | 05/11/17 | 05/09 to 05/11/17 | Portion on 06/07/17 | | |
| | 5 | 05/11/17 | 05/09 to 05/11/17 | Portion on 06/07/17 | | |
| 5089/1113 | 2 | 05/03/17 | 05/03/17 | 06/26/17 | 06/01/17 & 07/27/17 | Side Dressed 07/27/17 |
| 5089/1453 | 1 | 06/26/17 | 05/03/17 | 06/26/17 | 06/01/17 & 07/27/17 | Side Dressed 07/27/17 |
| | 2 | 06/26/17 | 05/03/17 | 06/26/17 | 06/01/17 & 07/27/17 | Side Dressed 07/27/17 |

*Note 1: The Preemergent Herbicide Appellants applied included 2 quarts of Deverinol per acre, 8 ounces of Spartan per acre, and 16 ounces of Prowl per acre. Appellants applied this herbicide mixture to control broadleaf weeds.*
*Note 2: Where the spreadsheet has no date for Fusilade DX or the table indicates only a portion was sprayed, Appellants failed to spray as they indicated the sprayer kept getting stuck due to the rainfall.*
*Note 3 – Adjuster1 (XXXXX) later revised the date to reflect 07/15 to 07/17/17.*

While Adjuster1 (XXXXX) completed the spreadsheets, Appellant1 (XXXXX) confirmed their accuracy on December 7, 2017. *(Appellants' Exhibit D, pages 1 – 2; XXXXX Exhibit H, pages 1 – 2; XXXXX Post-Hearing Exhibit B, pages 4 – 5; HA, Trk 8, 51:22 – 53:20.)*

56. In addition to the charts setting out the chemicals Appellants used in their burley tobacco operation, Adjuster1 (XXXXX) developed a chart based on CoOp receipts setting out the fertilizer Appellants applied during CY 2017. AdjTrainee (XXXXX) forwarded copies of Appellants' fertilizer receipts with her September 15, 2017, emails.[21] *(AR, pages 4240 – 4262, 4597 – 4609, 4613, 5136, 5147 – 5159, 5408, 5413 – 5420, 6695, 6697 – 6708, 6921 – 6933, 6937, 8215 – 8222, & 8383; XXXXX Exhibit H, pages 1 – 2; XXXXX Exhibit M, pages 16 – 28, 67 – 74, & 103 – 114.)*

57. XXXXX tasked AdjTrainee (XXXXX) with the Growing Season Inspection for Appellant1 (XXXXX). As a result, AdjTrainee (XXXXX) issued the following XXXXX Adjuster's Special Reports to Appellant1 (XXXXX):

- For FSN 5318, the report reflected 61.5 acres of tobacco with 32,684 total pounds (lbs) of tobacco or 531 lbs/acre. AdjTrainee (XXXXX) issued this report on November 6, 2017. *(AR, pages 3447 – 3448, 4225 – 4226, 5043 – 5044, 5145, & 5193 – 5194.)*
- For FSN 553, the report reflected 20 acres of tobacco with 1,811.0 total lbs or 90.6 lbs/acre. AdjTrainee (XXXXX) issued this report on December 7, 2017. *(AR, pages 3449, 3451, 4227 – 4228, 5045 – 5046, 5145, & 5195.)*
- For FSN 2320, the report reflected 24 acres with 2,441 total lbs or 102 lbs/acre. AdjTrainee (XXXXX) issued this report on December 7, 2017. *(AR, pages 3450 – 3451, 4229 – 4230, 5047 – 5048, & 5196 – 5197.)*

*(AR, pages 3447 – 3451.)*

58. On December 11, 2017, Appellant1 (XXXXX) provided Adjuster1 (XXXXX) with the soil samples Appellants relied on in making fertilizer decisions for CY 2017. *(4233 – 4239, 4919, 5049 – 5076, 5108, 5129 – 5135, 5510 – 5515, 5556, & 5559.)*

59. On December 28, 2017, Adjuster1 (XXXXX) completed separate XXXXX Adjuster's Special Reports on the following:

- The farming practices Appellant1 (XXXXX) followed. This report was originally dated August 28, 2017. (AR, pages 668 – 669, 4416 – 4417, 5528 – 5529, & 7585 – 7586.)
- Two reports on the farming practices Appellant2 (XXXXX) followed. The text of the two reports is similar except for references to the post-emergent herbicide Fusilade DX. *(AR, pages 674 – 675, 5109 – 5112 & 8378 – 8379.)*
- The farming practices Farmer1 (XXXXX) followed. This report was originally dated December 14, 2017. *(AR, pages 671 – 672, 5106 – 5107 & 6441 – 6442.)*

While Adjuster1 (XXXXX) issued the above individual reports, each report referenced all three Appellants and included similar text. Specifically, Adjuster1 (XXXXX) summarized Appellants' management practices, to include addressing their use of nitrogen, their application of muriatic potash, their use of pre-emergent herbicides, their off-label use of Fusilade DX, and their cultivation practices. In his reports, Adjuster1 (XXXXX) acknowledged periods of heavy rain throughout the growing season and that such rain could explain heavy weed pressure. Having said that, Adjuster1 (XXXXX) noted concerns with the amount of nitrogen Appellants applied per acre and Appellants use of muriatic potash as a source for potassium. In addition, the reports set out Adjuster1 (XXXXX)'s concern over the preemergent herbicide mixture Appellants applied, their use of the post-emergent herbicide Fusilade DX, and Appellants failure to hand-hoe / chop weeds. *(HA, Trk 8, 54:15 – 58:55.)*

60. On December 29, 2017, AdjTrainee (XXXXX) completed XXXXX Adjuster's Special Reports on Appellant1 (XXXXX) and Appellant2 (XXXXX). The texts of these reports mirror the text of Adjuster1 (XXXXX)'s December 28, 2017, XXXXX Adjuster's Special Reports. *(AR, pages 4231 – 4232, 5113 – 5114, 5239 – 5240, & 5524 – 5527.)*

61. On December 29, 2017, AdjTrainee (XXXXX) completed a XXXXX Adjuster's Pre-Harvest Growing Season Inspection (GSI) Field Review form for Appellant2 (XXXXX). In her report, AdjTrainee (XXXXX) noted that "post setting cultivation was not generally accepted in the area" and that the tobacco was very weedy. AdjTrainee (XXXXX) indicated the tobacco was not similar to that of other area producers. AdjTrainee (XXXXX) also noted that the weather for June and July included several days where the area had heavy rainfalls and that temperatures

were fairly normal. Although acknowledging that there were periods of heavy rainfall throughout the tobacco growing season, AdjTrainee (XXXXX) indicated that Appellant2 (XXXXX)'s management practices raised concerns about the lack of weed control. To that end, AdjTrainee (XXXXX) noted that while soil tests have been done within 5 years, "the recommendations have not been followed." Specifically, AdjTrainee (XXXXX) noted that "[f]ertilizer rates were not appropriate. An average of 145 lbs of Nitrogen per acre was applied. Soil samples recommended 250 lbs of nitrogen to produce 2,500 lbs of tobacco per acre (very close to his APH). This is only 75.2% of the recommended nitrogen." Further, AdjTrainee (XXXXX) noted that the tobacco appraised very low and was not comparable to other producers in the area. AdjTrainee (XXXXX) did not identify the area producers to whom she compared Apellant2 (XXXXX)'s tobacco crop. AdjTrainee (XXXXX) also found that the fields had a lot of weeds and were not taken care of like they should have been. Finally, AdjTrainee (XXXXX) found that there was wind damage on FSN 800. *(AR, pages 5386 & 5516.)*

62. As of February 20, 2018, XXXXX Production Worksheet Summary forms for Appellants reflected the following:

- For Appellant1 (XXXXX) *(AR, pages 4333 – 4335, 5531 – 5533, 5544 – 5546, & 7587 – 7589)*:

| FSN | Acres | Damage Date / Notice Date | Harvest Date | Production to Count |
|-----|-------|---------------------------|--------------|---------------------|
| 4920 | 66.76 | 06/05/27 / 06/08/17 | 10/04/17 | 7498.0 |
| 2320 | 24.0 | 06/05/17 / 06/08/17 | 10/04/17 | 749.0 |
| 553 | 20.0 | 06/05/17 / 06/08/17 | 10/04/17 | 594.0 |
| 5318 | 67.2 | 06/05/17 / 06/08/17 | 09/08/17 | 7540.0 |
| 7359 | 8.0 | 06/05/17 / 06/08/17 | 10/12/17 | 18056.0 |

- For Appellant2 (XXXXX) *(AR, pages 5534 – 5536, 5549 – 5551, & 8380 – 8382)*:

| FSN | Acres | Damage Date / Notice Date | Harvest Date | Production to Count |
|-----|-------|---------------------------|--------------|---------------------|
| 9 | 4.00 | Missing | Missing | 233.0 |
| 103 | 31.10 | Missing | Missing | 3296.0 |
| 178 | 85.30 | Missing | Missing | 9998.0 |
| 800 | .96 | Missing | Missing | 2506.0 |
| 3777 | 3.30 | Missing | Missing | 425.0 |

- For Farmer1 (XXXXX) *(AR, pages 5537 – 5538, 5547 – 5548, & 6439 – 6440)*:

| FSN | Acres | Damage Date / Notice Date | Harvest Date | Production to Count |
|-----|-------|---------------------------|--------------|---------------------|
| 966 | 26.80 | 06/08/17 / 06/08/17 | 08/08/17 | 3082.0 |
| 3410 | 25.50 | 06/08/17 / 06/08/17 | 08/08/17 | 3434.0 |
| 3655 | 53.35 | 06/08/17 / 06/08/12 | 08/08/17 | 3876.0 |
| 5089 | 30.42 | 06/08/17 / 06/08/17 | 10/06/17 | 2398.0 |

63. As Appellant1 (XXXXX), Appellant2 (XXXXX), and Farmer1 (XXXXX) had burley tobacco there, XXXXX obtained a copy of the Natural Resources Conservation Service (NRCS) Soil Survey of XXXXX County, XXXXX, in adjusting Appellants' loss claims. Appellant1 (XXXXX) also had crops in XXXXX and XXXXX County, XXXXX. However, there is no evidence indicating XXXXX obtained the NRCS Soil Surveys for either of these counties. *(AR, pages 4749 – 4890, 6204 – 6351, 7196 – 7342, & 7982 – 8129.)*

64. On February 23, 2018, XXXXX issued the following GFP decisions:

- For Appellant1 (XXXXX), denying his CY 2017 burley tobacco loss claim. *(AR, pages 68 – 72, 85 – 89, 576 – 580, 7106 – 7110, 7348 – 7352, & 10774 – 10778.)*
- For Appellant2 (XXXXX), denying his CY 2017 burley tobacco loss claim. *(AR, pages 78 – 82, 92 – 96, 7860 – 7864, 7943 – 7947, 8137 – 8141, & 10784 – 10787.)*
- For Farmer1 (XXXXX), denying his CY 2017 burley tobacco loss claim. *(AR, pages 73 – 77, 99 – 102, 568 – 571, 6038 – 6042, & 10779 – 10783.)*

In reaching the above decisions, XXXXX found the following not to be Good Farming Practices:

- Fertilizer used – excessive Muriatic Potash
- Fertilizer used – insufficient Nitrogen
- Preemergent Herbicide mixture – no evidence it met GFP recommendations
- Post-emergent Herbicide – off label use of Fusilade DX
- Weed Control – failure to hand-chop/hoe weeds

*(XXXXX Post-Hearing Exhibit A, pages 2 – 3; Appellants' Post-Hearing Exhibit D, pages 8 & 36 – 37; HA, Trk 9, 35:10 – 37:50.)*

65. On March 17, 2018, XXXXX received a Beginning Farmer and Rancher Application / Cancellation Form for the 2017 CY for Farmer1 (XXXXX) and Appellant3 (XXXXX). In addition, XXXXX received MPCI & Supplemental Product Application / Renewal and Policy Conversion Form for Farmer1 (XXXXX). The purpose of these documents was to place the coverage in Appellant3 (XXXXX)'s name following the death of her husband, Farmer1 (XXXXX).[22] *(AR, pages 6753 – 6763.)*

66. On March 24, 2018, XXXXX (AppRep (XXXXX)), Appellants' Representative, submitted letters to VP/ClmsMngr (XXXXX) seeking XXXXX review of the AIP's February 23, 2018, GFP decisions on behalf of the following:

- Appellant1 (XXXXX). *(AR, pages 83 – 89, 4321 – 4332, & 7111 – 7117.)*
- Appellant2 (XXXXX). *(AR, pages 90 – 96 & 7941 – 7947.)*
- Farmer1 (XXXXX). *(AR, pages 97 – 102 & 6052 – 6057.)*

AppRep (XXXXX) attached copies of the respective February 23, 2018, GFP decisions to his letters. In addition, AppRep (XXXXX) requested an additional 60 days to supplement XXXXX's file before XXXXX completed its review. Although they requested additional time to file documents with XXXXX, Appellants did not copy XXXXX on the documents they filed with RMA's SRCO for purposes of RMA's review of XXXXX's GFP decisions. XXXXX did not receive the additional documents until RMA provided them as attachments to the SRCO's May 13, 2019, decisions. *(HA, Trk 9, 37:50 – 41:00.)*

67. On March 24, 2018, AppRep (XXXXX) also submitted a letter to RMA's SRCO on behalf of the following:

- Appellant1 (XXXXX). *(AR, pages 4319 – 4320, 7118 – 7119, & 7974 – 7975.)*
- Appellant2 (XXXXX). *(Appellant Post-Hearing Exhibit A, pages 1 – 2.)*
- Farmer1 (XXXXX). *(AR, pages 6098 – 6099.)*

In his letter, AppRep (XXXXX) advised RMA's SRCO that Appellants had asked XXXXX to review its GFP decisions. In the event XXXXX refused to do so, Appellant sought RMA review of the decision. In making this request, Appellant sought an additional 90 days to submit additional evidence in support of Appellants' position. As attachments, AppRep (XXXXX) included the following:

- March 24, 2018, Letter to XXXXX (VP/ClmsMngr (XXXXX)) seeking AIP review. *(AR, pages 4321 – 4332)*
- XXXXX's February 23, 2018, GFP decisions. *(AR, pages 4323 – 4332.)*

*(XXXXX Post-Hearing Exhibit A, pages 2 – 3; Appellants' Post-Hearing Exhibit D, pages 2 – 3; HA, Trk 9, 37:50 – 41:00.)*

68. On April 4, 2018, RMA's SRCO acknowledged Appellants' request for RMA review of XXXXX's February 23, 2018, GFP decisions. In its letter, RMA approved Appellants' request for an additional 90 days to file evidence in the appeal. *(AR, pages 6376 – 6377, 7122 – 7123, & 7980 – 7981.)*

69. On June 18, 2018, the parties took the deposition of ClmsSupervisor (XXXXX). In his testimony, ClmsSupervisor (XXXXX) confirmed Appellants experienced excessive rain in June and early July 2017. Further, ClmsSupervisor (XXXXX) acknowledged that he did not reach out to any experts in reviewing Appellants' CY 2017 tobacco claims, relying instead on the Burley and Dark Tobacco Guide in evaluating Appellants' farming practices. Finally, ClmsSupervisor (XXXXX) testified that he did not make the decision as to whether XXXXX would pay Appellants' claims, rather he simply passed along information gathered by his adjusters. *(AR, pages 103 – 200, 907 – 939, (Highlighted) 1052 – 1149[23]___, Deposition Excerpts (Exc) 2249 – 2266, & 9792 – 1149; Appellants' Post-Hearing Exhibit D, pages 37 – 38.)*

70. On June 18, 2018, the parties took the deposition of VP/ClmsMngr (XXXXX). VP/ClmsMngr (XXXXX) was responsible for overseeing all XXXXX claims in Southeast United States. During his deposition, VP/ClmsMngr (XXXXX) confirmed that he did not know what Poast herbicide was used for. Further, VP/ClmsMngr (XXXXX) stated that he would have to read the label to know what Poast herbicide was used for and that he had not done so. As to Fusilade DX, VP/ClmsMngr (XXXXX) acknowledged that XXXXX understood Appellants had not sprayed all their tobacco. However, VP/ClmsMngr (XXXXX) stated that XXXXX did not know which fields Appellants had sprayed with Fusilade DX and which fields they had not. Further, VP/ClmsMngr (XXXXX) testified that he did not know how Fusilade DX impacted Appellants' burley tobacco. VP/ClmsMngr (XXXXX) went on to confirm that XXXXX did not consult with an expert concerning Appellants' CY 2017 loss claims, relying instead on the Burley and Dark Tobacco Guide. As for reviewing Appellants' claims, VP/ClmsMngr noted that XXXXX did not go through field by field to see if the AIP could pay any losses. Likewise, VP/ClmsMngr (XXXXX) confirmed that he, VP Claims (XXXXX), and ClmsSupervisor (XXXXX) did not reconvene or meet to review Appellants' loss claims after RMA issued its GFP decisions. Rather, VP/ClmsMngr stated that all he did was scan and file RMA's GFP decisions.[24]___ *(AR, pages 338 – 515, 1206 – 1264, (Highlighted) 1265 – 1442[25]___, Exc 2203 – 2235, Corrected Deposition Excerpts (Cor Exc) 2269 – 2301, & 9931 – 10108; Appellants' Post-Hearing Exhibit D, pages 37 – 38.)*

71. The parties deposed Adjuster1 (XXXXX) on:

- June 18, 2018 (Volume 1). During his deposition, Adjuster1 (XXXXX) confirmed he reviewed 84 tobacco claims in in XXXXX and XXXXX for XXXXX in CY 2017. Of the 84 claims, 24 were for burley tobacco. Out of the 24 burley tobacco claims Adjuster1 (XXXXX) reviewed in CY 2017 for XXXXX, the AIP denied only Appellants' three claims. Adjuster1 (XXXXX) acknowledged in his testimony that most of the CY 2017 claims were approved based on excessive moisture as the cause of loss. *(AR, pages 201 – 241, 1150 – 1164, (Highlighted) 1165 – 1205___[26], & 9890 – 9930.)*

- June 19, 2018 (Volume 2). During his second day of testimony, Adjuster1 (XXXXX) confirmed Appellants experienced heavy rainfall throughout the growing season. In acknowledging some of the weedy areas were in areas where rain had damaged or destroyed Appellants' tobacco, Adjuster1 (XXXXX) confirmed that all would have been damaged by excessive moisture throughout the growing season. Further, while confirming that he had not contacted any experts concerning Appellants' CY 2017 tobacco, Adjuster1 (XXXXX) testified that he believed ClmsSupervisor (XXXXX) had contacted an expert at the University of XXXXX.___[27] Finally, Adjuster1 (XXXXX) confirmed that he was not involved in, or aware of, any further review or adjustment of Appellants' loss claims after RMA issued its GFP decisions. *(AR, pages 242-337, 1443 – 1475, (Highlighted) 1476 – 1571___[28], Exc Volume 1 & Volume 2 2182 – 2202, Cor Exc Volume 1 & Volume 2 2327 – 2348, & 10109 – 10204.)*

72. On July 2, 2018, AppRep (XXXXX) submitted a request to SRCO seeking an additional 30 days to file evidence on behalf of Appellant1 (XXXXX), Appellant2 (XXXXX), and Farmer1 (XXXXX). On July 30, 2018, AppRep (XXXXX) submitted a second request to SRCO seeking an additional 30 days to file evidence. *(AR, pages 865 – 866, 6383, 7190, & 8130; Appellant's Post-Hearing Exhibit B, pages 1 – 8; XXXXX Post-Hearing Exhibit A, pages 2 – 3.)*

73. On September 4, 2018, Appellants provided a letter from XXXXX (CoOpMngr (XXXXX)), the XXXXX Farmers Co-Op Manager, to RMA's SRCO. CoOpMngr (XXXXX) reviewed Appellants' farming practices and found that their use of cover crops and fertilizer met Nitrogen requirements. CoOpMngr (XXXXX) also expressed the opinion that Appellants' use of Muriatic Potash did not adversely affect their burley tobacco yield or quality. Rather, CoOpMngr (XXXXX) felt that Appellants' losses were due to excessive rainfall. While recognizing Fusilade DX is not labeled for use with burley tobacco, CoOpMngr (XXXXX) found that its use in place of Poast herbicide to control grass was acceptable. Finally, CoOpMngr (XXXXX) noted that accepted GFP did not require hand-hoeing/chopping weeds where tobacco was a complete or near complete loss. XXXXX received this letter as an attachment to RMA's SRCO GFP decisions issued May 13, 2019. *(AR, pages 519 – 521, 764 – 766, 6593 – 6595, 7396 – 7398, 8208 – 8210, 8443 – 8445, & 12505 – 12507; XXXXX Post-Hearing Exhibit B, pages 5 – 6.)*

74. On September 4, 2018, Appellants provided a statement from XXXXX (CertCropAdv (XXXXX)), a Certified Crop Advisor, to RMA's SRCO. CertCropAdv (XXXXX) reviewed Appellants' farming practices and concluded that Appellants' pre-emergence herbicide mixture met herbicide requirements for burley tobacco. CertCropAdv (XXXXX) went on to note that excessive moisture drowned out much of the CY 2017 tobacco. Where tobacco was drowned out, CertCropAdv (XXXXX) expressed the opinion that hand-hoeing would not be required. As to Appellants' use of Fusilade DX, which was not labeled for burley tobacco, CertCropAdv (XXXXX) noted that it is frequently used to combat grass as an alternative for Poast herbicide as they have similar chemical compositions. Based on Appellants' use of cover crops and fertilizer, CertCropAdv (XXXXX) concluded that Appellants met the recommended Nitrogen

requirements. Finally, CertCropAdv (XXXXX) concluded Appellants' use of Muriatic Potash did not affect their burley tobacco yield or quality. Rather, CertCropAdv (XXXXX) concluded Appellants' burley tobacco losses were due to excessive rainfall. XXXXX received this statement as an attachment to RMA's SRCO GFP decisions dated May 13, 2019. *(AR, pages 516 – 518, 525 – 527, 767 – 770, 6590 – 6592, 7393 – 7395, 8205 -8207; & 8447 – 8449; XXXXX Post-Hearing Exhibit B, pages 5 – 6.)*

75. On September 4, 2018, Appellants provided a statement from XXXXX Agronomist1 (XXXXX), an Agronomist at the XXXXX Farmer's Co-Op, to RMA's SRCO. Based on his review of Appellants' farming practices, Agronomist1 (XXXXX) concluded that Appellants' reliance on cover crops and fertilizer met Nitrogen requirements. Argonomist1 (XXXXX) also concluded that Appellants' use of Muriatic Potash would not affect their burley tobacco yield or quality. Rather, Argonomist1 (XXXXX) concluded that Appellants' burley tobacco losses were due to excessive rainfall. While acknowledging that Fusilade DX is not approved for use with burley tobacco, Argonomist1 (XXXXX) noted that it has the same mode of action as Poast herbicide for controlling grass. Further, Agronomist1 (XXXXX) found that the herbicide mixture Appellants used met pre-emergence herbicide requirements for burley tobacco. Finally, Agronomist1 (XXXXX) expressed the opinion that GFP did not require a producer to hand-hoe/chop weeds where tobacco was a complete or near complete loss. XXXXX received this statement as an attachment to RMA's SRCO's GFP decisions dated May 13, 2019. *(AR, pages 522 – 524, 783 – 786; 6571 – 6573, 7374 – 7376, & 8186 – 8188.)*

76. On September 13, 2018, RMA's SRCO again acknowledged receipt of Appellants' request for review of XXXXX's February 23, 2018, GFP Decisions. RMA noted that it had approved Appellants' initial request for an additional 90 days to file evidence. Since then, RMA noted that it had received requests for additional time on July 2, 2018; July 30, 2018; and September 10, 2018. RMA indicated that it granted all of Appellants' requests and that the Agency would begin its review of XXXXX's GFP Decision 30 days from the date Appellants received this letter. *(AR, pages 865 – 866, 6383 – 6384, 7190 – 7191, & 8130 – 8131; Appellants' Post-Hearing Exhibit B, pages 11 – 16; XXXXX Post-Hearing Exhibit A, pages 2 – 3; HA, Trk 9, 41:00 – 44:35.)*

77. On October 4, 2018, AppRep (XXXXX) emailed SRCO with a final request for an additional 30 days to file evidence on behalf of Appellant1 (XXXXX), Appellant2 (XXXXX), and Farmer1 (XXXXX). This final request followed AppRep (XXXXX)'s receipt of 2,782 pages of documents filed by XXXXX on September 10, 2018, in support of the AIP's February 23, 2018, GFP decisions. On October 17, 2018, the SRCO approved AppRep (XXXXX)'s final request for additional time to file evidence. *(AR, pages 865 – 866, 6883, 7190, & 8130; Appellants' Post-Hearing Exhibit B, pages 9 – 10 & 17 – 20; XXXXX Post-Hearing Exhibit A, pages 2 – 3.)*

78. On November 5, 2018, Appellant1 (XXXXX) submitted a written statement to RMA's SRCO. In his statement, Appellant1 (XXXXX) explained Appellants' use of a combination of ground cover crops and fertilizer to meet the Nitrogen requirements for their burley tobacco. While acknowledging that Fusilade DX is not labeled for burley tobacco, Appellant1 (XXXXX) noted that Appellants used it as an alternative to Poast herbicide to control grass. Based on his experience, Appellant1 (XXXXX) indicated he was not aware of any injury to burley tobacco resulting from the use of Fusilade DX. Further, Appellant1 (XXXXX) noted that excessive wet weather adversely impacted Appellants' burley tobacco yield and quality in CY 2017. Finally, Appellant1 (XXXXX) noted that the lay of land of Appellants' farms made the excessive rainfall and flooding particularly devastating to Appellants' burley tobacco crop. XXXXX received this statement as an attachment to RMA's SRCO's GFP decisions dated May 13, 2019. *(AR, pages 544 – 547, 758 – 762, 6582 – 6585, 7385 – 7388, 8197 – 8200, & 9103 – 9106; XXXXX Post-Hearing Exhibit B, pages 5 – 6.)*

79. On November 5, 2018, Appellant2 (XXXXX) submitted a written statement to RMA's SRCO. Appellant2 (XXXXX)'s statement used language similar to that in Appellant1 (XXXXX)'s statement to address Appellants' application of Nitrogen and their post-emergence use of Fusilade DX as an alternative to Poast herbicide to control grass. Finally, Appellant2 (XXXXX) used similar language to attribute Appellants' burley tobacco yield and quality loss to excessive rain and flooding. XXXXX received this statement as an attachment to RMA's SRCO's GFP decisions dated May 13, 2019. *(AR, pages 548 – 551, 753 – 757, 6586 – 6589, 7389 – 7392, 8201 – 8204, 8438 – 8441, & 9107 – 9110; XXXXX Post-Hearing Exhibit B, pages 5 – 6.)*

80. On November 6, 2018, AppRep (XXXXX) filed a Disclosure Statement concerning CertCropAdv (XXXXX) to RMA's SRCO. The purpose of the statement was to demonstrate CertCropAdv (XXXXX) had no personal or business relationship with Appellants. *(AR, page 552; Appellants' Post-Hearing Exhibit D, page 20.)*

81. On November 8, 2018, AppRep (XXXXX) submitted a letter to RMA's SRCO setting out Appellants' position and arguments challenging XXXXX's GFP decisions. As attachments, AppRep (XXXXX) included:

- Appellant1 (XXXXX)'s November 5, 2018, Statement. *(AR, pages 544 – 547.)*
- Appellant2 (XXXXX)'s November 5, 2018, Statement. *(AR, pages 548 – 551.)*
- CoOpMngr (XXXXX)'s September 4, 2017, Letter. *(AR, pages 519 – 521.)*
- CertCropAdv (XXXXX)'s September 4, 2018, Statement. *(AR, pages 516 – 518.)*
- A November 6, 2018, Disclosure Statement concerning CertCropAdv (XXXXX). *(AR, page 552)*
- Copies of invoices from the XXXXX Farmers CoOp covering the period from September 10, 2016, through October 13, 2016. Appellants relied on these invoices to demonstrate the cover crop they used on their fields prior to planting their CY 2017 burley tobacco. *(AR, pages 771 – 779, 2756 – 2763, 6574 – 6581, 7377 – 7384, & 8189 – 8196; Appellants' Post-Hearing Exhibit C, pages 1 – 3.)*
- Photographs depicting the different phases of Appellants' CY 2017 tobacco operation. *(AR, pages 5692, 5743 – 5769, 5821 – 5825, 5836 – 5842, 5844 – 5845, 5847 – 5851, 5853 – 5854, 5859, 8661 – 8664, 8666 – 8671, 8685, & 8693; Appellants' Post-Hearing Exhibit C, pages 1 – 3[29].)*
- Photographs of Appellants' burley tobacco, to include the following:
  o For Appellant1 (XXXXX):
    - Of FSN 553, with language indicating the tobacco drowned until cut. *(AR, pages 3483 – 3484, 5707 – 5708, 5878 – 5879, 7409 – 7410, & 8705 – 8706.)*
    - Of FSN 2320, with language indicating the field was beside a creek and that water stood in the fields most of the time. In addition, the language noted that Appellants plowed and side dressed the tobacco. *(AR, pages 3503, 3526 – 3530, 5711 – 5718, 5866 – 5871, 5880 – 5881, 7399 – 7404, & 8699 – 8700.)*
    - Of FSN 4920, with language indicating tobacco drowned out after setting. *(AR, pages 3551 – 3552, 5731 – 5732, 5876 – 5877, 7405 – 7406, & 8701 – 8702.)*
    - Of FSN 5318, with language indicating Appellants side dresses the tobacco and that rain stood in river-bottoms most of the year. *(AR, pages 3572 – 3573, 5739 – 5740, 5872 – 5873, 7407 – 7408, & 8703 – 8704.)*
    - Of FSN 7359, with language indicating the tobacco in this county was good. *(AR, pages 5016 – 5017, 5741 – 5742, & 5874 – 5875.)*
  o For Appellant2 (XXXXX):

- Of FSN 9, with language indicating the tobacco drowned with nothing much left. *(AR, pages 3926 – 3927, 5697 – 5698, 5893 – 5894, 8169 – 8170, & 8715 – 8716.)*
- Of FSN 103, with language indicating Appellants side dressed the tobacco and that it drowned the rest of the season. *(AR, pages 3944 – 3945, 5701 – 5702, 5889 – 5890, 8173, 8175, & 8719 – 8720.)*
- Of FSNs 103 and 178, with language indicating Appellants were setting the tobacco. *(AR, pages 3706 – 3707, 3942 – 3943, 5699 – 5700, 5887 – 5888, 8171 – 8172, & 8717 – 8718.)*
- Of FSN 178, with language indicating Appellants set the tobacco, that the tobacco had drowned spots everywhere, and that the drowned spots were present all year. *(AR, pages 3702 – 3705, 5703 – 5706, 5883 – 5886, 8175 – 8176, & 8721 – 8722.)*
- Of FSN 800, with language indicating Appellants cut the field early because the tobacco had blown down. *(AR, pages 5000 – 5001, 5709 – 5710, 5891 – 5892, 8177 – 8178, & 8723 – 8724.)*

o For Farmer1 (XXXXX) and Appellant3 (XXXXX):
- Of FSNs 966 and 3410, with language indicating the tobacco was starting to drown or was drowning. *(AR, pages 3770 – 3773, 3786 – 3791, 5719 – 5724, 5807 – 5808, & 5817 – 5820.)*
- Of FSN 3655, with language indicating Appellants were getting ready to set or setting the tobacco. *(AR, pages 3595 – 3598, 5727 – 5730, 5809 – 5810, 5815 – 5816, 6556 – 6559, & 8707 – 8710.)*
- Of FSNs 3655 and 3777, with language indicating Appellants were rained out. *(AR, pages 3593 – 3594, 5725 – 5726, & 5805 – 5806.)*
- Of FSN 5089, with language indicating Appellants set, plowed, and side dressed the tobacco. In addition, the language noted that rain washed away and drowned out the tobacco. *(AR, pages 3524 – 3525, 3620 – 3623, 5733 – 5738, 5803 – 5804, 5811 – 5814, 6560 – 6563, & 8711 – 8714.)*

The language on the photographs provided by Appellants often includes descriptions of more than just what appears in the photograph. Specifically, the language on the photographs often summarizes Appellants' view of what happened in the field throughout the growing season. Appellant1 (XXXXX) took the photographs for Appellants, and Appellant2 (XXXXX) provided the written text accompanying the photograph. *(AR, pages 553 – 557, 6564 – 6566, 7367 – 7371, 8179 – 8183, 9111 – 9115, 10788 – 10792, & 10793 – 10797; Appellants' Exhibit H, pages 1 – 5; Appellants' Exhibit I, pages 1 – 13; Appellants' Post-Hearing Exhibit C, pages 1 – 3; Appellants' Post-Hearing Exhibit D, page 3; XXXXX Post-Hearing Exhibit A, pages 2 – 3; HA, Trk 9, 43:00 – 44:35.)*

82. XXXXX filed a Report by XXXXX, PhD (Expert1 (XXXXX)) concerning Appellants' CY 2017 burley tobacco operation. In his report, Expert1 (XXXXX) confirmed that Appellants experienced a rainy growing season, with heavy rainfall between June 30, 2017, and July 6, 2017. Expert1 (XXXXX)'s report also noted that some of the photographs provided by XXXXX indicate water damage. As to Fusilade DX, Expert1 (XXXXX) indicated that it had the same activity as Poast herbicide. As both were effective for grasses and had no effect on broadleaf weeds, Expert1 (XXXXX) could see no reason for using it as it was not approved for tobacco. Finally, Expert1 (XXXXX)'s report addressed hand-hoe/chopping by noting that it is most effective when there is limited weed pressure. Where there is heavy weed pressure, Expert1 (XXXXX)'s report indicated hand-hoeing would be unsuccessful. As attachments, the report included:

- Weather data. *(AR, pages 536-541.)*
- Soil Test for *(AR, page 542)*:

- o Appellant1 (XXXXX) for FSNs 178, 553, 2320, & 4920
- o Appellant2 (XXXXX) for FSNs 009, 103, 800, & 5318
- Growing Season Management Chart for Appellant1 (XXXXX) put together by Adjuster1 (XXXXX). *(AR, pages 543, 3284, 4241, 4574, 5137, 6898, & 11446 – 11447; Appellants' Exhibit D, pages 1 – 2; XXXXX Exhibit C, page 1; XXXXX Exhibit H, pages 1 – 2; XXXXX Exhibit K, page 1; XXXXX Exhibit N, page 1.)*

This was XXXXX's first use of an expert in reviewing Appellants' CY 2017 farming operations. *(AR, pages 528 – 543.)*

83. On December 11, 2018, AppRep (XXXXX) submitted a cover letter to RMA's SRCO. Attached to the letter was the following:

- A copy of Agronomist1 (XXXXX)'s September 4, 2018, statement. *(AR, pages 522 – 524, 6571 – 6573, 7374 – 7376, & 8186 – 8188.)*

*(AR, pagers 6569 – 6570, 7372 – 7373, & 8184 – 8185.)*

84. On February 5, 2019, submitted a Cover Letter and Demand For Arbitration forms to XXXXX on behalf of the following:

- Appellant1 (XXXXX), listing the amount in dispute as totaling $514,404. Along with the Cover Letter, AppRep (XXXXX) included copies of a Demand for Arbitration and XXXXX's February 23, 2018, GFP Decision. *(AR, pages 558 – 559, 572 – 580, & 7344 – 7352.)*
- Appellant2 (XXXXX), listing the amount in dispute as totaling $322,695. Along with the Cover Letter, AppRep (XXXXX) included copies of a Demand for Arbitration and XXXXX's February 23, 2018, GFP Decision. *(AR, pages 78 – 82, 562 – 563, & 8133 – 8141.)*
- Appellant3 (XXXXX on behalf XXXXX), listing the amount in dispute as totaling $424,777. Along with the Cover Letter, AppRep (XXXXX) included copies of a Demand for Arbitration and XXXXX GFP decision. *(AR, pages 73 – 77, 560 – 561, 564 – 567, & 6386 – 6393.)*

Appellants took this action as the parties believed that the pending GFP reviews before RMA did not toll Appellants' deadline for requesting arbitration under their policies. However, the parties agreed to defer the arbitration proceeding until RMA issued its GFP determinations. *(XXXXX Post-Hearing Exhibit A, pages 2 – 3; HA, Trk 9, 44:35 – 46:30.)*

85. On February 22, 2019, AppRep (XXXXX) submitted a letter to RMA's SRCO seeking to substitute Appellant3 (XXXXX) for her husband Farmer1 (XXXXX) who had passed away on June 9, 2017. In support of Appellants' request, AppRep (XXXXX) included language from the CCI Policy BP ¶ 2(g)(1). *(AR, pages 2473 & 6553 – 6555.)*

86. On May 13, 2019, RMA's SRCO issued decisions upholding XXXXX's February 23, 2018, GFP decisions as they related to Appellants' off-label use of Fusilade DX and their failure to hand-hoe/chop weeds. Relying on a series of emails between SRCO RMA staff and XXXXX, PhD (ExtSpc (XXXXX)), an Extension Tobacco Specialist with the University of XXXXX, the SRCO reversed XXXXX's February 23, 2018, decisions as they related to Nitrogen, Muriatic Potash, and Appellants' use of a pre-emergence herbicide mixture. Specifically, ExtSpc (XXXXX) confirmed that Appellants' use of cover crop and fertilizer met their Nitrogen requirements.

Further, ExtSpc (XXXXX) indicated that Appellants' use of Muriatic Potash did not affect the yield or quality of their burley tobacco. Finally, ExtSpc (XXXXX) noted that Appellants' pre-emergence herbicide mixture fell within the recommended range for burley tobacco. Based on the above reasoning, SRCO issued the following GFP decisions:

- Appellant1 (XXXXX). *(AR, pages 581 – 597, 802 – 818, 9116 – 9132, 9332 – 9348, 9548 – 9564, 10798 – 10814, 11014 – 11030, & 11230 – 11246.)*
- Appellant2 (XXXXX). *(AR, pages 598 – 614, 819 – 835, 8384 – 8400, 9133 – 9149, 9349 – 9365, 9556 – 9581, 10815 – 10831, 11031 – 11047, 11247 – 11263, & 12466 – 12482.)*
- Appellant3 (XXXXX on behalf Farmer1 (XXXXX)). *(AR, pages 615 – 631, 836 – 852, 6608 – 6623, 9150 – 9166, 9366 – 9382, 9582 – 9598, 10832 – 10848, 11048 – 11064, & 11264 – 11280.)*

The SRCO included various attachments, some of which applied to all three decisions and some of which were applicable to specific Appellants. As noted above, this was the first XXXXX learned of the additional evidence Appellants filed before RMA. *(AR, pages 632 – 796, 6624 – 6693, 8401 – 8475, 9167 – 9331, 9383 – 9547, 9599 – 9763, 10849 – 11013, 11065 – 11229, & 11281 – 11445; XXXXX Exhibit L, pages 1 – 2; Appellants' Post-Hearing Exhibit D, pages 3, 8 – 9, & 36 – 37; XXXXX Post-Hearing Exhibit A, pages 2 – 3; HA, Trk 9, 46:30 – 48:20.)*

87. On June 12, 2019, AppRep (XXXXX) faxed a request to RMA's Acting Deputy Administrator for Insurance Services requesting reconsideration of SRCO's May 13, 2019, Decisions upholding XXXXX's February 23, 2018, GFP Decisions. With the request, AppRep (XXXXX) set out Appellants' position challenging XXXXX's February 23, 2018, GFP Decisions. In addition to copies of SRCO's May 13, 2019, Decisions upholding XXXXX's February 23, 2018, GFP Decisions, AppRep (XXXXX) included all the attachments Appellants submitted to RMA's SRCO on November 8, 2018.[30] *(AR, pages 516 – 521, 544 – 552, & 797 – 854; Appellants' Post-Hearing Exhibit C, pages 1 – 3; HA, Trk 9, 48:20 – 48:50.)*

88. On August 27, 2019, RMA's National Office issued its decision, on reconsideration, upholding SRCO's decision. To the extent it related to (1) Appellants' off-label use of Fusilade DX, a post-emergent herbicide; and (2) Appellants' failure to hand-hoc its tobacco crop, the National office agreed that Appellants failed to follow good farming practices. As to (1) Fertilizer – Potash, (2) Fertilizer – Nitrogen, and (3) Preemergent Herbicide, the National Office agreed with the SRCO that Appellants' practices met GFP for burley tobacco. In reaching its decision, RMA noted that its decision did not determine whether an insurable cause of loss such as drowned tobacco plants existed. In addition, RMA noted that "[i]f you do not agree with the amount your insurance company assessed for your failure to follow good farming practices, you may choose to arbitrate or mediate the dispute in accordance with Section 20 of the Basic Provisions within one year of the date of this letter." *(AR, pages 855 – 876, 6714 – 6737, & 12483 – 12504; Appellants' Post-Hearing Exhibit D, pages 8 – 9 & 36 – 37; XXXXX Post-Hearing Exhibit A, pages 2 – 3; XXXXX Post-Hearing Exhibit B, page 17; HA, Trk 9, 48:50 – 53:25.)*

89. On September 4, 2019, AppRep (XXXXX) sent a letter to XXXXX asking if the AIP would reconsider its prior decision denying Appellants' entire loss claims in light of RMA's August 27, 2019, decision. In the event XXXXX elected not to do so, Appellants asked to immediately proceed to arbitration. AppRep (XXXXX) included RMA's August 27, 2019, Decision as an attachment to Appellants' request. *(AR, pages 877 – 878, 6714 – 6737, 7415 – 7438, & 8476 – 8499; Appellants' Post-Hearing Exhibit D, pages 3 – 4 & 9; XXXXX Post-Hearing Exhibit A, pages 2 – 3; HA, Trk 7, 1:22:30 – 1:24:10; HA, Trk 9, 53:25 – 55:05.)*

90. Adjuster1 (XXXXX) confirmed XXXXX received RMA's August 24, 2019, GFP decision and that he forwarded a copy to VP/ClmsMngr (XXXXX). VP/ClmsMngr (XXXXX) confirmed that XXXXX reviewed RMA's decision and that he scanned the document and placed it in Appellants' claim files without further action. *(Deposition, AR page 1220.)* In his deposition testimony, ClmsSupervisor (XXXXX) indicated that VP/ClmsMngr (XXXXX) forwarded copies of the RMA GFP decisions to him and that XXXXX personnel "may have had a phone call about it or talked at a later date." *(Deposition, AR page 920.)* As XXXXX still had concerns with Appellants' post-emergent weed control, to include the off-label use of Fusilade DX and the failure to hoe / chop weeds, Adjuster1 (XXXXX) indicated XXXXX felt Appellants' losses were still entirely due to uninsured causes.[31] *(XXXXX Post-Hearing Exhibit B, pages 12 – 14; HA, Trk 9, 1:07:06 – 1:22:85.)*

91. On January 28, 2020, the Arbitrator issued a scheduling order setting a three-day Arbitration Hearing for June 17, 2020, to June 19, 2020. On May 12, 2020, the Arbitrator issued an Order rescheduling the three-day Arbitration Hearing for August 26, 2020, to August 28, 2020. *(AR, pages 879 – 881, 906, 9764 – 9766, & 9791; XXXXX Post-Hearing Exhibit A, pages 2 – 3; HA, Trk 9, 55:05 – 56:25.)*

92. On March 21, 2020, XXXXX (Respondent)[32] submitted its Pre-Hearing Arbitration Brief. *(AR, pages 882 – 905 & 9767 – 9790.)*

93. On June 15, 2020, Appellants filed documents showing XXXXX paid Farmer2 (XXXXX)'s burley tobacco loss claim in full. In addition to photographs for Farmer2 (XXXXX)'s crops dated July 7, 2017, and located next to some of Appellants' fields, Appellants provided an XXXXX's Proof of Loss form, dated March 15, 2017, reflecting the following:

| FSN / County | Reported Acres / Determined Acres | Pounds to count / Deficiency | Payable Indemnity |
|---|---|---|---|
| 4833 / XXXXX Co | 4 acres / 5.34 acres | 371 lbs / 4,025 lbs | $7,044.00 |
| 4125 / XXXXX Co | 16.85 acres / 6.26 acres | 1,621 lbs / 22,346 lbs | $39,106.00 |
| 5318 / XXXXX Co | 57.6 acres / 57.05 acres | 6,209 lbs / 83,417 lbs | $145,980.00 |

The total loss reported came to $192,130. While the cause of loss listed was excessive moisture, there was no mention of weed issues. XXXXX paid the loss with interest ($115,508.72) by check dated January 30, 2018. Appellant1 (XXXXX) confirmed that as part of the family farming operation, Farmer2 (XXXXX) followed the same farming practices Appellants applied in CY 2017. *(AR, pages 6887 – 6891; XXXXX Exhibit E, pages 1 – 12; XXXXX Post-Hearing Exhibit A, pages 2 – 3; Appellants' Post-Hearing Exhibit D, pages 38 – 39 & 48; XXXXX Post-Hearing Exhibit B, pages 5 – 6; HA, Trk 7, 47:05 – 47:44; HA, Trk 8, 1:25:48 – 1:28:35; HA, Trk 9, 56:25 – 57:25.)*

94. Appellants also provided evidence of tobacco loss claims XXXXX adjusted and ultimately paid for XXXXX (Farmer3 (XXXXX)) and XXXXX (Farmer4 (XXXXX)) in CY 2017. This included the following:

- For Farmer3 (XXXXX) *(AR, pages 5681 – 5688)*:

| County / FSN | Acres | Damage Date / Notice Date | Harvest Date | Production to Count |
|---|---|---|---|---|
| XXXXX | 2.5 | 07/01/17 / 07/03/17 | 01/08/18 | 7913.0 |

| | | 12624 | | | 09/02/17 / 09/04/17 11/10/17 / 11/14/17 | | |


| County / FSN | Acres | Damage Date / Notice Date | Harvest Date | Production to Count |
|---|---|---|---|---|
| 12624 | | 09/02/17 / 09/04/17 11/10/17 / 11/14/17 | | |
| XXXXX 542 | 5.01 | 07/01/17 / 07/03/17 09/02/17 / 09/04/17 11/10/17 / 11/14/17 | 02/01/18 | 14700.0 |
| XXXXX 3489 | 1.8 | 07/01/17 / 07/03/17 09/02/17 / 09/04/17 11/10/17 / 11/14/17 | 02/13/18 | 5860.0 |
| XXXXX 1972 | 83.15 | 07/03/17 / 07/03/17 09/02/17 / 09/04/17 | 12/18/17 | 43.567.0 which XXXXX revised to 17,484.0 |

- For Farmer4 (XXXXX) *(AR, pages 5673 – 5680)*:

| County / FSN | Acres | Damage Date / Notice Date | Harvest Date | Production to Count |
|---|---|---|---|---|
| XXXXX 5456 | 6.50 | 07/03/17 / 07/07/17 09/02/17 / 09/04/17 | 02/20/18 | 3828.0 which XXXXX revised to 1642.0 |
| XXXXX 1608 | 33.19 | 07/03/17 / 07/07/17 09/02/17 / 09/04/17 | 02/20/18 | 16004.0 which XXXXX revised to 8203.0 |
| XXXXX 4292 | 5.20 | 07/03/17 / 07/07/17 09/02/17 / 09/04/17 | 02/22/18 | 3948.0 |
| XXXXX 4324 | 31.14 | 07/03/17 / 07/07/17 09/02/17 / 09/04/17 | 02/15/18 | 6819.0 |

The reported causes of loss for the above claims were Excessive Moisture / Precipitation and Hurricane / Tropical Depression. Appellants also provided a map showing the relationship of the above XXXXX Counties to their farms in XXXXX. While Appellants provided evidence of nearby comparable acreage, XXXXX did not. *(AR, pages 2481 & 8644; Appellants' Post-Hearing Exhibit D, pages 38 & 40; HA, Trk 8, 1:25:48 – 1:28:35.)*

95. On June 17, 2020, the parties took the deposition of Appellant1 (XXXXX). During his deposition, Appellant1 (XXXXX) clarified how Appellants applied Fusilade DX to their tobacco crop. Specifically, Appellant1 (XXXXX) stated that Appellants did not spray the full field, rather they spot sprayed Fusilade DX only in the areas where it was necessary. This was the first XXXXX learned that Appellants had spot sprayed Fusilade DX as needed. Prior to the deposition, XXXXX believed Appellants had applied Fusilade DX field-wide in all areas other than those few fields where the sprayer got stuck. *(AR, pages 940 – 1005; XXXXX Post-Hearing Exhibit A, pages 2 – 3; XXXXX Post-Hearing Exhibit B, pages 5 – 6; HA, Trk 9, 57:25 – 1:03:10.)*

96. On June 17, 2020, the parties took the deposition of Appellant2 (XXXXX). *(AR, pages 1006 – 1051.)*

97. On July 1, 2020, the parties took the deposition of AdjTrainee (XXXXX), the XXXXX Adjuster assigned to the GSI. *(AR, pages 1572 – 1616, Exc 2153 – 2157, Revised Deposition Excerpts (Rev Exc) 2236 – 2248, Cor Exc 2349 – 2361, 10205 – 10206, 10207 – 10249, & Highlighted 10250 – 01292.)*

98. On July 17, 2020, the parties took the deposition of Expert1 (XXXXX), XXXXX's expert. *(AR, pages 1660 – 1776, Highlighted 1777 – 1887, Exc 2158 – 2181, Cor Exc 2302 – 2326, & 10293 -10294.)*

99. On July 20, 2020, AppRep (XXXXX) submitted Appellants' Indemnity Calculations for their loss claims. On August 20, 2020, AppRep (XXXXX) provided Appellants' revised Indemnity Calculations for Appellants' loss claims. *(AR, pages 5583 & 5672; Appellants' Exhibit D, page 2.)*

100. On July 22, 2020, the parties took the deposition of CoOpMngr (XXXXX). *(AR, pages 1888 – 1919, 1922 – 1923, & 10297 – 10298.)*

101. On July 22, 2020, the parties took the deposition of CertCropAdv (XXXXX). *(AR, pages 1920 – 1921, 1924 – 1957, & 10295 – 10296.)*

102. On August 21, 2020, Appellants (Claimants) filed their Pre-Hearing Arbitration Brief. *(AR, pages 1960 – 1968 & 10301 – 10309.)*

103. As part of arbitration, Appellants filed weather data from the following National Oceanic and Atmospheric Administration (NOAA) collections points:

   • The XXXXX, XXXXX collection point. *(AR, pages 8555 – 8577.)*
   • The XXXXX 2.8 WSW, XXXXX collection point. *(AR, pages 8578 – 8600.)*

   Appellants relied on the weather data from these collection points, running from January 1, 2017, through December 31, 2017, to support their claim that they experienced an eligible cause of loss. As the parties have not disputed the presence of excessive precipitation during the CY 2017 growing season, I have not made detailed summaries of the weather data provided. *(AR, page 2078; Agency Exhibit 6, page 6; Appellants' Post-Hearing Exhibit D, pages 9 & 39.)*

104. The Arbitrator held a three-day hearing beginning August 26, 2020. In addition to the transcript, the Arbitration hearing record included excerpts and corrected excerpts from the depositions of the following witnesses:

   • AdjTrainee (XXXXX), taken July 1, 2020. *(AR, pages 2153 – 2157, 10310 – 10314, Rev Exc 2236 – 2248, Rev Exc 10393 – 10405, & Cor Exc 2349 – 2361.)*
   • Expert1 (XXXXX), taken on July 17, 2020. *(AR, pages 2158 – 2181, 10315 – 10338, Cor Exc 2302 – 2326, Cor Exc 10426 – 10450.)*
   • Adjuster1 (XXXXX), Volume 1 taken on June 18, 2018, and Volume 2 taken on June 19, 2018. *(AR, pages 2182 – 2202, 10339 – 10359, Cor Exc 2327 – 2348, Cor Exc 10469 – 10490.)*
   • VP/ClmsMngr (XXXXX), taken on June 18, 2018. *(AR, pages 2203 – 2235, 10360 – 10392, Cor Exc 2269 – 2301, & Cor Exc 10509 – 10541.)*
   • ClmsSupervisor (XXXXX), taken on June 18, 2018. *(AR, pages 2249 – 2266, 10406 – 10423, Cor Exc 10451 – 10468, & Cor Exc 10491 – 10508.)*

   *(AR, pages 1969 – 2152, 2267 – 2268, & 10424 – 10425; Appellants' Post-Hearing Exhibit D, pages 4 & 35; XXXXX Post-Hearing Exhibit A, pages 2 – 3; HA, Trk 9, 1:03:10 – 1:03:25.)*

105. To provide context to the photographs XXXXX provided, Appellants developed a Google Earth presentation. Using this presentation, Appellant1 (XXXXX) provided a reference to the location for the XXXXX photographs as they related to Appellants' farms. The Google Earth presentation included the following:

| Producer | Location | FSN | Location in Exhibit S |
|---|---|---|---|
| Appellant1 (XXXXX) | XXXXX County | 4920 | Pages 233 – 263 |
| | XXXXX County | 553 | Pages 298 – 318 |
| | | 2320 | Pages 92 – 112 & 272 – 297 |
| | | 5318 | Pages 204 – 232 |
| | XXXXX County | 7359 | Pages 264 – 271 |
| Appellant2 (XXXXX) | XXXXX County | 9 | Pages 168 – 181 |
| | | 103 | Pages 182 – 201 |
| | | 178 | Pages 117 – 167 |
| | | 800 | Pagers 113 - 118 |
| | | 3777 | Pages 202 – 203 |
| Farmer1 (XXXXX) | XXXXX County | 966 | Pages 335 – 340 |
| | | 3410 | Pages 319 – 334 |
| | | 3655 | Pages 375 – 404 |
| | | 5089 | Pages 341 – 374 |

In addition, Exhibit S, pages 1 – 91, reflects the location of the pictures and notes provided by Appellants. While the Agency Record indicates RMA was unable to print and provide this presentation for purposes of the appeal, Appellants provided a two-dimensional presentation of the document. *(AR, page 8643; Appellants' Exhibit D, pages 13 – 14 & 33; Appellants' Exhibit S, pages 1 – 404; Appellants' Exhibit T, pages 1 – 50; Appellants' Exhibit U, pages 1 – 8; Appellants' Post-Hearing Exhibit C, pages 1 – 3.)*

106. On or about October 2, 2020, Appellants (Claimants) filed their Post-Arbitration Brief. In addition, AppRep (XXXXX) submitted Appellants' draft Arbitration Award and Findings of Fact and Claimants' Proposed Arbitration Award and Findings of Fact. *(AR, pages 2362 – 2440 & 10542 – 10584.)*

107. On or about October 2, 2020, XXXXX (Respondent) filed its Post-Arbitration Brief. In addition, XXXXX submitted proposed Arbitration Findings of Fact. *(AR, pages 2441 – 2471 & 10585 – 10615.)*

108. On November 2, 2020, the Arbitrator issued his Arbitration Award and Findings of Fact in favor of Appellants (Claimants), approving their full loss claims. In reaching this decision, the arbitrator noted the following:

- Having summarized the basis for XXXXX's GFP decisions in Arbitrator Finding of Fact (ARB FOF) 14, the Arbitrator noted in ARB FOF 18 that RMA's GFP decisions concluded that the "XXXXX did follow an adequate fertilization application," that "overapplication of muriatic potash did not likely reduce [the Claimants'] burley tobacco yields," and that the "preemergence herbicide program was documented as adequate." *(AR, page 2476.)*
- In ARB FOF 19, the Arbitrator noted that RMA determined Claimants "did not follow GFP because they failed to implement appropriate [post-emergence] weed control measures." *(AR, page 2476.)*
- In ARB FOF 23, the Arbitrator found that XXXXX concedes that it did not reconvene its staff or otherwise review or attempt to update its initial GFP determination and the assignment of 100 percent of each Claimants' 2017 burley tobacco losses to the failure to follow good farming practices, the uninsured cause of loss. *(AR, pages 2476 – 2477.)*

- In ARB FOF 24, the Arbitrator found that until it recently reached out to Expert1 (XXXXX), XXXXX did not seek an opinion from an agricultural expert. *(AR, page 2477.)*
- In ARB FOF 25, the Arbitrator, in reliance on the testimony of VP/ClmsMngr (XXXXX), found XXXXX did nothing in response to RMA's SRCO May 13, 2019, GFP decisions and RMA's National Office August 27, 2019, GFP decision, except to review, can, and file them. *(AR, page 2477.)*
- In ARB FOF 35, the Arbitrator found that XXXXX conceded that Claimants' 2017 burley tobacco was subject to excessive rainfall and flooding during the 2017 CY, and that XXXXX claims staff confirmed in their written reports and testimony the presence of excessive rainfall "in June, July, August, September, and even in the first part of October[.]" *(AR, pages 2478 – 2479.)*
- In ARB FOF 45, the Arbitrator found that Claimants assert, and XXXXX concedes, that Claimants' 2017 burley tobacco crops "sustained damage due to one or more insured causes of loss – excessive precipitation/moisture, including flooding, and in the case of [Appellant2 (XXXXX)'s] FSN 800, wind." *(AR, page 2480.)*
- In ARB FOF 73, the Arbitrator found that Claimants, Claimants' Experts, and XXXXX's Expert, explained that repeated rainfall events have had the impact of leaching away residual herbicide and nutrients, natural and man-made applied. *(AR, page 2484.)*
- In ARB FOF 80, the Arbitrator found that "[w]ithout any available post-emergence herbicide for the broadleaf weeds, Claimants['] remedial efforts were limited to a post-emergence herbicide application that targeted grass." *(AR, page 2486.)*
- In ARB FOF 91, the Arbitrator found that "[t]o the extent that Claimants failed to follow good farming practices by failing to implement appropriate or additional post-emergence weed control measures, those failures did not cause or contribute to the Claimants' losses in yield or quality of their 2017 Burley tobacco crop." *(AR, page 2487.)*
- In ARB FOF 92, the Arbitrator noted, "I find that each Claimants' 2017 Burley tobacco losses were caused 100 percent by excessive precipitation and moisture."

As neither party sought review of the Arbitrator's November 2, 2020, decision, I find the above findings of fact to be binding on the parties and applicable to this appeal. *(AR, pages 2472 – 2489 & 10689 – 10706; XXXXX Exhibit F, pages 1 – 2; Appellants' Post-Hearing Exhibit D, pages 4 & 35; XXXXX Post-Hearing Exhibit A, pages 2 – 3; HA, Trk 7, 38:40 – 39:45; HA, Trk 8, 1:28:50 – 1:29:25 & 1:31:27 – 1:31:30; HA, Trk 9, 1:03:25 – 1:06:10.)*

109. On November 9, 2020, XXXXX's Attorney issued a letter to AppRep (XXXXX) along with the following checks in payment of the Appellants' CY 2017 burley tobacco claims:

- Check No. 645630, dated November 6, 2020, to Appellant1 (XXXXX) totaling $26,237.24. *(AR, page 2491.)*
- Check No. 720627, dated November 5, 2020, to Appellant1 (XXXXX) totaling $451,296.00. *(AR, page 2492.)*
- Check No. 645631, dated November 6, 2020, to Appellant2 (XXXXX) totaling $23,013.59. *(AR, page 2495.)*
- Check No. 720629, dated November 5, 2020, to Appellant2 (XXXXX) totaling $295,985.00. *(AR, page 2493.)*
- Check No. 645632, dated November 6, 2020, to Farmer1 (XXXXX) totaling $16,927.88. *(AR, page 2494.)*

*(AR, page 2490; HA, Trk 9, 1:03:25 – 1:06:10.)*

110. On November 9, 2020, XXXXX's Attorney issued a second letter to AppRep (XXXXX), noting that XXXXX had inadvertently left out a check from the previous packet. Attached to the letter, XXXXX included Check No. 720628, dated November 5, 2020, to Farmer1 (XXXXX) totaling $402,394.00. *(AR, page 2496.)*

111. On November 10, 2020, Appellants sent a letter to XXXXX's Attorney wherein AppRep (XXXXX) raised concerns over discrepancies in the payments XXXXX issued to Appellants. A series of emails followed as AppRep (XXXXX) and XXXXX's Attorney attempted to resolve the matter. *(AR, pages 2497 – 2504; XXXXX Exhibit I, page 2; HA, Trk 9, 1:03:25 – 1:06:10.)*

112. On November 16, 2020, XXXXX's Attorney issued another letter to AppRep (XXXXX) along with the following Replacement Checks in payment of the Appellants' CY 2017 burley tobacco claims:

   - Check No. 645826, dated November 13, 2020, to Appellant1 (XXXXX) totaling $26,802.84. *(AR, pages 2507 & 2678.)*
   - Check No. 645827, dated 11/13/20, to Appellant2 (XXXXX) totaling $17,356.52. *(AR, pages 2508 & 2679.)*
   - Check No. 645828, dated November 13, 2020, to Appellant3 (XXXXX on behalf Farmer1 (XXXXX)) totaling $23,596.39. *(AR, pages 2506 & 2677.)*
   - Check No. 721077, dated November 12, 2020, to Appellant3 (XXXXX on behalf Farmer1 (XXXXX)) totaling $402,394.00. *(AR, pages 2505 & 2676.)*

   Even accounting for the replacement checks, XXXXX made full payment within 30 days of the Arbitration Award. *(AR, pages 2509 – 2511 & 2671 – 2672; Appellants' Post-Hearing Exhibit D, page 4; XXXXX Post-Hearing Exhibit A, pages 2 – 3; HA, Trk 7, 39:45 – 40:51; XXXXX Post-Hearing Exhibit B, pages 1, 18, 21 – 22, & 24; HA, Trk 8, 1:29:25 – 1:31:30; HA, Trk 9, 1:06:10 – 1:07:06.)*

113. On January 26, 2021, Appellants filed a request with RMA seeking a § 20(i) Finding under the CCI Policy Basic Provisions which would allow Appellants to seek extracontractual damages in Federal Court. As attachments, Appellants included the following:

   - A copy of the Complaint Appellants filed in United States (US) District Court for Middle District of XXXXX. *(AR, pages 10618 – 10645; Appellants' Exhibit V, pages 1 – 28; HA, Trk 7, 40:51 – 41:40; HA, Trk 8, 40:50 – 41:35.)*
   - A copy of 17-BR, the CCI Policy Basic Provisions. *(AR, pages 10646 – 10688.)*
   - A copy of the November 2, 2020, Arbitration Award and Findings of Fact in favor of Claimants (Appellants), approving Appellants full loss claims. *(AR, pages 10698 – 10706.)*

   *(AR, pages 2512 – 2513, 10616 – 10617, & 10707 – 10708; Appellants' Post-Hearing Exhibit D, pages 4 – 5 & 45; HA, Trk 7, 41:40 – 42:20.)*

114. On March 11, 2021, AppRep (XXXXX) provided RMA with a hyperlink to Appellants' January 26, 2021, Request for a § 20(i) Finding under the CCI Policy Basic Provisions, which would allow Appellants to seek extracontractual damages in Federal Court. Appellants did so after learning RMA was unable to locate its copy of Appellants' January 26, 2021, request. On the same date, XXXXX (LdLglSpc1 (XXXXX)), an RMA Lead Legal Specialist, replied by email confirming RMA's receipt of Appellants' Request for a § 20(i) Finding. XXXXX was copied on these emails. *(AR, pages 2514 – 2515 & 2517 – 2518; XXXXX Exhibit I, page 2; Agency Post-Hearing Exhibit 1, page 1; HA, Trk 8, 41:38 – 44:50.)*

115. On March 17, 2021, XXXXX replied to RMA concerning Appellants' request for a § 20(i) Finding. While conceding that the arbitrator disagreed with and overturned XXXXX's GFP decisions, XXXXX disagreed with Appellants' contention that RMA should make the § 20(i) Finding. Specifically, XXXXX noted Appellants made no showing of XXXXX's willful or egregious failure to comply with terms of policy or procedures. In fact, XXXXX argued Appellants failed to reference any provisions or procedures XXXXX failed to follow in adjusting their claims. On the same day, LdLglSpc1 (XXXXX) forwarded XXXXX's reply to XXXXX (CompInvest1 (XXXXX)), an RMA Compliance Investigator. *(AR, pages 2516 – 2517; XXXXX Exhibit I, page 2.)*

116. On March 18, 2021, CompInvest1 (XXXXX) advised AppRep (XXXXX) that she would serve as RMA's point of contact for Appellants' Request for § 20(i) Finding. On the same date, AppRep (XXXXX) replied by email confirming he would be the point of contact for Appellants. *(AR, pages 2519 – 2520; XXXXX Exhibit I, page 2.)*

117. On March 22, 2021, RMA's Administrative Review Division Director contacted AppRep (XXXXX) by letter acknowledging RMA's receipt of Appellants' Request for a § 20(i) Finding under the CCI Policy Basic Provisions. RMA confirmed CompInvest1 (XXXXX) would serve as the Agency's point of contact for the matter. RMA further noted that in the event they needed additional information from Appellants, the Agency would contact AppRep (XXXXX). *(AR, page 2521; XXXXX Exhibit I, page 2; Appellants' Post-Hearing Exhibit D, page 45.)*

118. On March 29, 2021, CompInvest1 (XXXXX) emailed AppRep (XXXXX) with RMA's First Request For Information (RFI). Specifically, RMA noted that Appellants failed to identify the policies or procedures that Appellants believed XXXXX failed to follow. In addition, RMA advised AppRep (XXXXX) that, in accordance with MGR 14-010, Appellants would need to show how such failure rose to the level of egregious and willful conduct on XXXXX's part. In a series of emails, AppRep (XXXXX) advised CompInvest1 (XXXXX) that Appellants would provide a response to RMA's First RFI. *(AR, pages 2522 – 2524; XXXXX Exhibit I, page 2; HA, Trk 8, 36:50 – 37:40.)*

119. On April 29, 2021, RMA's Administrative Review Division Director sent a letter (Second RFI) to AppRep (XXXXX) in follow-up to the Agency's First RFI contained in CompInvest1 (XXXXX)'s March 29, 2021, email. The letter, serving as a Second RFI, noted that Appellants failed to file a response and that Appellants would have 10 days to respond. RMA also noted that if it received no response within 10 days, the Agency would dismiss Appellants' Request for a § 20(i) Finding under the CCI Policy Basic Provisions. CompInvest1 (XXXXX) provided a copy of RMA's Second RFI to AppRep (XXXXX) by email on April 29, 2021. In turn, AppRep (XXXXX) confirmed Appellants would supplement their Request for a § 20(i) Finding as requested. *(AR, pages 2525 – 2527 & 2529 – 2530; XXXXX Exhibit I, page 2.)*

120. On May 7, 2021, Appellants responded to RMA's Second RFI. Specifically, Appellants argued XXXXX failed to follow policy and procedures when:

- XXXXX failed to ascertain, or even deliberate, the extent to which Appellants' losses were due to an insured cause of loss after RMA's May 13, 2021, GFP Decision.
- XXXXX failed to seek the advice of an agricultural expert when evaluating to what extent Appellants' losses were due to eligible versus ineligible causes of loss.
- XXXXX failed to follow § 1221 and § 1221A of Loss Adjustment Manual (LAM) Standards Handbook (HB), which sets out guidance concerning how to conduct insured versus uninsured loss analysis.

- XXXXX employees discussed the process set out in § 1221 and § 1221A before deciding not to follow it. Specifically, Appellants noted that XXXXX referred to the LAM § 1221 and § 1221A process in internal XXXXX emails.

Finally, Appellants argued that XXXXX's actions led to Appellants' devasting loss in excess of the unpaid indemnity as they lost their family farms. Appellants provided RMA a copy of their response by email on May 7, 2021. *(AR, pages 2528 & 2531 – 2539; XXXXX Exhibit I, page 2; HA, Trk 7, 41:40 – 42:45; HA, Trk 8, 44:50 – 46:04.)*

121. On receiving notice of Appellants' Response to RMA's Second RFI, XXXXX confirmed that it wished to file a response. CompInvest1 (XXXXX) advise XXXXX that the AIP had 15 days to submit its response. Based on a medical emergency, XXXXX's Representative sought additional time to file their response. As Appellants had no objection, RMA granted XXXXX's request for additional time to respond. *(AR, pages 2540 – 2550; XXXXX Exhibit I, pages 2 – 3.)*

122. On June 4, 2021, XXXXX submitted a letter to RMA setting out its response to Appellants' Request for a § 20(i) Finding under the CCI Policy basic Provisions. Specifically, XXXXX argued as follows:

- Under the Arbitration Award, Appellants received everything they were entitled to under their burley tobacco policies.
- XXXXX followed policies and procedures in evaluating Appellants' CY 2017 burley tobacco claims. Specifically, XXXXX contends that:
  - Nothing required XXXXX to re-evaluate Appellants' claims after RMA's August 27, 2019, Reconsideration Decision.
  - Under the policy, Arbitration was the correct method for resolving Appellants' dispute over XXXXX's decision denying their claims.
  - Under § 14(f) of the policy, Appellants' right to payment did not mature until 30 days after arbitration was completed. Further, XXXXX met the § 14(f) deadlines following the Arbitration decision.
- Appellants failed to show any failure by XXXXX was willful and egregious. Specifically, XXXXX noted that:
  - While XXXXX discussed insured versus uninsured causes of loss, XXXXX felt it could not accurately determine between the two.
  - XXXXX's initial GFP decision addressed the full growing season. This included Appellants' practices related to Fertilizer, Preemergent Herbicide, Post-Emergent Herbicide, and Hand Chopping / Hoeing weeds versus Appellants' claim of excessive moisture. XXXXX contends that it could not accurately distinguish percentages of loss between insured versus uninsured causes of loss.
  - XXXXX had no access to tobacco farms near Appellants for comparison.[33]
  - Even after XXXXX employees discussed RMA's August 27, 2019, GFP Decision, they found issues with Post-Emergent Weed Control; thus, they were unable to accurately distinguish percentages between insured versus uninsured causes of loss.

As attachments to its response, XXXXX included the following:

- XXXXX's March 29, 2021, Motion to Dismiss filed in Federal District Court for the Middle District of XXXXX. *(AR, pages 2560 – 2592.)*
- Appellants' April 2, 2021, Response to XXXXX's March 29, 2021, Motion to Dismiss filed in the Federal District Court. *(AR, pages 2593 – 2613.)*

- XXXXX's May 3, 2021, Reply to Appellants' Response filed in the Federal District Court. *(AR, pages 2614 – 2620.)*
- Excerpts from depositions of the following witnesses:
  - Adjuster1 (XXXXX), Volume 2, taken on June 19, 2018. *(AR, pages 2621 – 2624.)*
  - ClmsSupervisor (XXXXX), taken on June 18, 2018. *(AR, pages 2625 – 2627.)*
  - VP/ClmsMngr (XXXXX), taken on June 18, 2018. *(AR, pages 2628 – 2632.)*
- Excerpts from Arbitration Transcript, August 26, 2020, to August 28, 2020. Specifically, XXXXX referenced the testimony of Adjuster1 (XXXXX) and VP/ClmsMngr (XXXXX). *(AR, pages 2634 & 2641.)*

*(AR, pages 2551 – 2559; XXXXX Exhibit I, page 3.)*

123. On June 7, 2021, CompInvest1 (XXXXX) sent an email to AppRep (XXXXX) and XXXXX advising the parties that RMA had closed the record in Appellants' Request for a § 20(i) Finding. *(AR, page 2646; XXXXX Exhibit I, page 3.)*

124. On September 8, 2021, CompInvest1 (XXXXX) emailed XXXXX, with a copy to AppRep (XXXXX), setting out RMA's Third RFI. Specifically, RMA asked that XXXXX provide or identify where in the record there was evidence XXXXX had timely paid Appellants the full amount due under their policies. XXXXX responded by providing RMA with the following:

- A copy of the November 2, 2020, Arbitrator Award and Findings of Fact. *(AR, pages 2650 – 2667.)*
- A copy of XXXXX's November 9, 2020, Cover Letter and the attached checks issued as payment on Appellants' loss claims. *(AR, pages 2680 – 2681 & 2684 – 2685.)*
- A copy of XXXXX's second November 9, 2020, Letter with the check that XXXXX had inadvertently left out. *(AR, page 2686.)*
- A copy of AppRep (XXXXX) November 10, 2020, Letter raising questions concerning discrepancies in payment. Along with this letter, XXXXX provided copies of the supporting email chain. *(AR, pages 2668 – 2670 & 2673 – 2674.)*
- A copy of XXXXX's November 16, 2020, letter, and the attached replacement checks. *(AR, pages 2671 – 2672 & 2675 – 2679.)*

On receipt of XXXXX's reply to RMA's Third RFI, the Agency did not issue another notice closing the record. *(AR, pages 2648 – 2649; XXXXX Exhibit I, page 3.)*

125. On October 14, 2021, CompInvest1 (XXXXX) emailed AppRep (XXXXX), with a copy to XXXXX, indicating RMA needed an additional 30 days to issue its decision on Appellants' Request for a § 20(i) Finding. RMA has no record that the parties responded to the Agency's request. *(AR, page 2687; XXXXX Exhibit I, page 4.)*

126. On December 3, 2021, RMA issued a decision denying Appellants' Request for a § 20(i) Finding under the CCI Policy Basic Provisions. In reaching her decision, the Deputy Administrator for Compliance (DAC), after reviewing the administrative record, noted that "I find no proof that [XXXXX] failed to comply with FCIC policies and procedures[.]" Further, the DAC found that Appellants "received the total amount [they] were entitled to under [their policies]." In summarizing her decision, the DAC explained that in order for RMA to issue a § 20(i) finding, the requestor must show "first that the AIP failed to comply with FCIC policies and procedures, and second that the failure resulted in the requestor receiving an amount less than they were entitled to receive under the applicable policy." In addressing Appellants' argument that XXXXX failed to comply with policy or procedures, the DAC noted that while FCIC procedures

allowed for an AIP to seek an expert opinion, they did not require that the AIP do so. The DAC went on to find that XXXXX complied with basic guidelines when it assessed 100 percent of Appellants' losses to an uninsured cause of loss, which in this case was a failure to follow Good Farming Practices. Likewise, the DAC found that nothing required XXXXX to reconvene it's claim staff to re-evaluate Appellants' loss claims after RMA issued its final GFP decision on August 27, 2019. Finally, in a footnote, the DAC found that the Arbitrator awarded Appellants the full indemnity under their MPCI policies with interest. In noting that there was no dispute over the fact that Appellants received the amount they were due under their policies, the DAC indicated she would not discuss the second requirement further. On the same day, CompInvest1 (XXXXX) emailed a copy of the decision to the parties. *(AR, pages 2688 – 2695 & 2712 – 2718; XXXXX Exhibit I, page 4; Appellants' Post-Hearing Exhibit D, pages 5 & 45 – 47; XXXXX Post-Hearing Exhibit B, pages 17 – 18; HA, Trk 7, 44:00 – 44:35; HA, Trk 8, 1:31:30 – 1:33:55.)*

127. On January 6, 2022, Appellants sought NAD review of RMA's December 3, 2021, adverse decision. Appellants perfected their appeal before NAD on the same date. XXXXX was identified as an Interested Party to the appeal. *(AR, pages 2696 – 2707 & 2719 – 2726; HA, Trk 1, 1:55:00 – 1:55:38; BOX Adverse Decision Folder formerly Case Record Tab 2 and Tab 4.)*

128. As part of the appeal, Appellants presented Probate Documents establishing the death of Appellant3 (XXXXX on behalf XXXXX) and confirming the appointment of Appellant2 (XXXXX) and XXXXX as representatives of the Estate. *(AR, pages 2709 – 2711.)*

129. In challenging RMA's denial of their request for a § 20(i) finding, Appellants submitted the opinions of an expert witness, XXXXX (Expert2 (XXXXX)). Appellants established Expert2 (XXXXX)'s background, which includes extensive experience in the crop insurance industry. As part of that experience, Expert2 (XXXXX) co-authored the inaugural loss adjustment handbook used by RMA, which evolved into the LAM used today. Having reviewed XXXXX's actions in handling Appellants' CY 2017 loss claims, Expert2 (XXXXX) indicated he had no objection to XXXXX's initial decision assigning 100 percent of the loss to a failure to follow Good Farming Practices. However, Expert2 (XXXXX) expressed the opinion that XXXXX failed to follow FCIC policies and procedures when it failed to re-evaluate Appellants' claims after RMA's final GFP decision on August 27, 2019. In identifying the policies or procedures at issue, Expert2 (XXXXX) pointed to LAM § 1221(c) which requires an AIP to document between insured and uninsured causes of loss. In support of his opinion, Expert2 (XXXXX) noted that XXXXX did such a re-evaluation with the loss claims filed by Farmer3 (XXXXX) and Farmer4 (XXXXX) but did not do so with Appellants' loss claims. As to the requirement that an AIP use expert opinion, Expert2 (XXXXX) acknowledged that while the LAM authorizes an AIP to use an expert, it does not require that an AIP do so. Finally, Expert2 (XXXXX) raised no dispute over the fact that Appellants received the full indemnity they were entitled to under their policies plus interest. Rather, Expert2 (XXXXX) expressed the opinion that Appellants suffered damages outside the policy as a result of XXXXX's handling of their loss claims. Based on this reasoning, Expert2 (XXXXX) expressed the opinion that Appellants met the requirements for a § 20(i) finding. *(AR, pages 2480 & 8971; Appellants' Exhibit W, pages 1 – 2; Appellants' Post-Hearing Exhibit D, pages 48 – 49; HA, Trk 7, 1:00:30 – 1:25:15, 1:27:15 – 1:49:55, 2:01:38 – 2:09:30, 2:10:20 – 2:18:41, & 2:19:00 – 2:21:15.)*

130. While acknowledging that they received 100 percent of what was due under their MPCI policies, Appellants noted that this did not occur until after arbitration. Appellants contend that they suffered extensive damages outside of the policy due to XXXXX's delay in paying their claims. As a means of establishing their losses resulting from XXXXX's handling of their loss claims,

Appellants provided copies of interrogatories filed in Federal Court. In these filings, Appellants claim extra contractual damages exceeding $2,000,000. This figure includes:

- Losses incurred based on the sale of equipment following CY 2017.
- Losses on the sale of real estate following CY 2017.
- Denial of the benefit of previous investments in eight greenhouses, a bale barn, bale barn equipment, a bunkhouse of H2A workers, and four tobacco barns.
- Losses on the sale of livestock, to include sales resulting from Appellants' inability to lease the requirement pastureland.
- Losses of the benefits from real estate contracts following CY 2017.
- Lost tobacco sales following CY 2017.
- Attorney's fees and expenses.
- Damages associated with Appellants' mental and emotional distress arising from XXXXX's wrongful withholding of Appellants' indemnity payment.

*(Appellants' Exhibit E, pages 15 – 18; Appellants' Exhibit F, pages 15 – 18; Appellants' Exhibit G, pages 15 – 18; Post-Hearing Exhibit D, pages 7 & 47; HA, Trk 7, 47:45 – 51:20.)*


## DISCUSSION

Title Seven of the Code of Federal Regulations (C.F.R.) Part 11 governs this appeal. Appellant has the burden of showing error in the Agency's adverse decision. *See 7 C.F.R. § 11.8(e)*. NAD's role is to ensure the adverse decision is consistent with the laws, regulations, and generally applicable interpretation of the laws and regulations governing the FCIP. The regulations governing the issues on appeal are at 7 C.F.R. Part 11 (National Appeals Division) and 7 C.F.R. Part 400 (General Administrative Regulations). The applicable crop insurance policies appear in 7 C.F.R. Part 457 (Common Crop Insurance Regulations). In interpreting the policies and procedures applicable to the FCIP, RMA relies on the Los Adjustment Manual (LAM), the GFP Handbook, and FADs.

**Did RMA err in finding Appellants failed to show XXXXX did not comply with FCIC policies and procedures in handling Appellants' CY 2017 burley tobacco claims? Yes.**

*Background Leading to § 20(i) Dispute*

In CY 2017, Appellants operated a burley tobacco operation in multiple counties in XXXXX. *FOF 1 – 7, 13, 17 – 18, 55, 58, 63, 78 – 79, & 95 – 96*. As a risk management tool for their operations, Appellants individually obtained MPCI coverage for their burley tobacco crops through XXXXX. *FOF 3 – 4 & 13*. The area received excessive rainfall during June to early October 2017 and, as a result, Appellants submitted Notice of Loss forms to XXXXX. *FOF 9, 16, 36, 38, 59 – 61, 69, 71, 73 – 75, 78 – 79, 82, 103, & 108*. In addition to Appellants' loss claims, XXXXX also responded to Spot Check requests from RMA's SRCO for Appellant1 (XXXXX) and Appellant2 (XXXXX), which were triggered by FSA. *FOF 8 & 43*. As a result, various XXXXX employees participated in evaluating Appellants' CY 2017 burley tobacco crops. *FOF 8 – 12, 14 – 35, 37 – 62, 69 – 71, & 97*. Ultimately, XXXXX issued GFP decisions finding that Appellants failed to follow GFP and assigning 100 percent of Appellants' losses to uninsured causes of loss. *FOF 64*. Disagreeing with XXXXX's GFP determinations, Appellants sought review before RMA's SRCO. *FOF 64, 67 – 68, 72, 76 – 77, 83, & 85*. On May 13, 2019, RMA's SRCO issued its decisions upholding XXXXX as to Appellants' post-transplant actions but reversing as to XXXXX's remaining GFP determinations. *FOF 86*. Specifically, RMA's SRCO agreed that Appellants' off-label use of Fusilade DX and their failure to hand-hoe / chop weeds amounted to a failure to follow GFP. *FOF 86*. However, RMA's SRCO found that Appellants'

use of cover crop and fertilizer met their Nitrogen requirements, that Appellants' use of Muriatic Potash did not affect the yield or quality of their burley tobacco, and that Appellants' pre-emergence herbicide mixture fell within the recommended range for burley tobacco. *FOF 86*. On review, RMA's National Office upheld the SRCO decisions. *FOF 86 – 88 & 108*. As XXXXX made no changes to its initial decisions assigning 100 percent of Appellants' losses to their failure to follow GFP, the parties proceeded to arbitration. *FOF 64, 86, 88 – 94, 102 – 104, & 106 – 108*. Appellants were successful at arbitration, with the Arbitrator finding 100 percent of Appellants' losses were due to excessive precipitation / moisture. *FOF 108*. As this is an insured cause of loss, the Arbitrator awarded Appellants the full indemnity due under their policies with interest. *FOF 108*. Having succeeded at arbitration, Appellants filed action in the Federal district court and sought a finding under the CCI Basic Provisions § 20(i) to pursue extracontractual damages. *FOF 113 – 114*.

## § 20(i) Dispute

RMA erred in finding Appellants failed to show that XXXXX failed to comply with FCIC policies and procedures. Under CCI Policy Basic Provisions § 20(d)(1), an AIP is responsible for making determinations assigning production to uninsured causes of loss. The Loss Adjustment Manual (LAM) makes clear that MPCI provides protection only against unavoidable loss to named insured causes of loss that occur during the insurance period. *See LAM ¶ 1212A(1)*. Among other places, uninsured causes of loss can be found in the CCI Policy Basic Provisions. *See LAM ¶ 1221A(3)*. A review of § 12 of the CCI Policy Basic Provisions confirms that eligible causes of loss include unavoidable naturally occurring events. However, the failure to follow GFP is among the named uninsured causes of loss. *See CCI Policy Basic Provisions § 12(b)*. The LAM notes that in every case, an AIP must establish whether damage or loss is due solely to one or more insured causes of loss, to both unavoidable insured causes of loss and uninsured causes of loss, or solely to one or more uninsured causes of loss. *See LAM ¶ 1221A(7)*. In determining the amount of loss due to uninsured causes of loss, an AIP is to determine and document the amount of damages based on agricultural experts' published opinions or an expert's written opinions. *See LAM ¶ 1221 C(3)(a); LAM ¶1221C(7)*. An AIP can also determine and document damages attributed to uninsured causes of loss based on comparisons to productivity and yields on surrounding farms. *LAM ¶ 1221C(3)(b)*. Comparable acreage can also be based on additional acreage the insured has *(LAM ¶ 1221E(2)(a))*, farms in the area *(LAM ¶ 1221 E(1) and (2))*, or farms in the surrounding area *(LAM ¶ 1221F)*. The CCI Policy Basic Provisions place the burden on the insured to establish that that a loss was caused by one or more insurable causes of loss to be eligible for an indemnity. *See CCI Policy Basic Provisions § 14E(e)(4) (iii)*.

Appellants argue that XXXXX failed to meet the above FCIC policies and procedures when it failed to re-evaluate their loss claim following RMA's final GFP decision on August 27, 2019. RMA and XXXXX respond by noting that nothing in RMA's GFP decisions required XXXXX to re-evaluate Appellants' loss claims. *See FOF 86 & 88*. XXXXX also notes that in a previous FAD, RMA has specifically noted that an RMA GFP decision in favor of a policyholder does not automatically mean that the policyholder qualifies for raised production to count. *See FAD 284*. However, FAD 284 goes on to note that an AIP can only remove that production that resulted from the failure to follow GFP and that if this is less than the production guarantee, the producer would be entitled to an indemnity. *See FAD 284*. I would also note that in a prior FAD, RMA has found that besides looking for GFP, an AIP has to make sure there has been an insurable cause of loss and that any loss was due to such cause of loss. *See FAD 102*. Under 7 C.F.R. § 400.766(b)(2), such written FADs are binding on all participants in the FCIP. As FAD 284 makes it clear that Appellants were due an indemnity payment for any production not resulting from its failure to follow GFP concerning post-transplant weed control, I conclude I must consider the merits of Appellants' argument concerning XXXXXs' actions following

RMA's final GFP decision on August 27, 2019.[34]

Before addressing Appellants', specific arguments concerning XXXXX's actions following RMA's final GFP decision on August 27, 2019, I will address the evidence I find relevant to this analysis. In their closing argument, Appellants include extensive references to evidence produced at arbitration and findings of fact in the Arbitrator's November 2, 2020, Award. I question the relevance of this material given that Appellants' argument before NAD concerns XXXXX's actions at the time of RMA's final GFP decision on August 27, 2019. Given Appellants' argument on appeal, the following discussion will rely primarily on facts in the record at or before August 27, 2019.

Appellants argue that XXXXX failed to follow FCIC policy and procedures by failing to seek the opinion of an agricultural expert when adjusting Appellants' loss claims. There is no dispute over the fact that XXXXX did not obtain an expert opinion until it sought the opinion of Expert1 (XXXXX). *FOF 69 – 72, 82, 98, & 108.* Further, XXXXX did not provide Expert1 (XXXXX)'s opinion until shortly before RMA's SRCO GFP decisions on May 13, 2019. *FOF 82 – 86.* Thus, while there is no question that XXXXX did not initially seek the assistance of an agricultural expert in reviewing Appellants' loss claims, the analysis does not end there. The question is not whether XXXXX sought the assistance of an agricultural expert, but whether FCIC policy and procedures required XXXXX to do so. This issue is addressed in the LAM. Specifically, the LAM provides that in determining the amount of loss due to uninsured causes of loss, an AIP is to determine and document the amount of damages based on agricultural experts' published opinions or an expert's written opinions. *See LAM ¶ 1221 C(3)(a); LAM ¶1221C(7).* RMA and XXXXX argue that this language allows an AIP to rely on an agricultural experts written opinion but does not require that an AIP do. Further, Appellants' own expert, Expert2 (XXXXX), confirmed that while the LAM authorizes an AIP to utilize an expert's written opinion, it does not require the AIP to do so. *FOF 129.* Under these circumstances, I conclude Appellants' argument in this regard to be without merit.

Appellants next contend that XXXXX failed to follow FCIC policy and procedures when it failed to obtain and consider comparable farms when determining Appellants' loss claims. As noted above, the LAM addresses this by noting that an AIP can also determine and document damages attributed to uninsured causes of loss based on comparisons to productivity and yields on surrounding farms. *LAM ¶ 1221C(3)(b).* XXXXX responds by noting that LAM ¶ 1221E(2) recognizes that circumstances may exist wherein comparable farms are not available. XXXXX argues such is the case here. To that end, XXXXX cited to the arbitration testimony of VP/ClmsMngr (XXXXX) which indicated comparable farms must be within one to two miles of the farms at issue and that the farms of family members cannot serve as comparable farms. XXXXX cited no authority in support of this position. Rather, the LAM notes that comparable acreage can be based on additional acreage the insured has *(LAM ¶ 1221E(2)(a))*, farms in the area *(LAM ¶ 1221 E(1) and (2))*, or farms in the surrounding area *(LAM ¶ 1221F)*. The fact that the same producer can provide comparable acreage seems to directly conflict with XXXXX's argument that family members' farms in the area cannot serve as comparable acreage. I would also note that the fact that XXXXX's own claims staff made general references to comparable acreage in reviewing Appellants' loss claims conflicts with the AIP's argument that comparable acreage is limited to farms within two miles of the farms at question. Specifically, Adjuster1 (XXXXX) testified that he had adjusted 84 tobacco claims for XXXXX in XXXXX and XXXXX, 24 of which involved burley tobacco. *FOF 71.* Of the 24 burley tobacco claims, Adjuster1 (XXXXX) confirmed that XXXXX paid all but Appellants' three claims, most of which were for excessive precipitation / moisture. *FOF 71.* In addition, in her Growing Season Reports issued on December 29, 2017, AdjTrainee (XXXXX) referenced area producers without documenting where such farms were located. *FOF 61.* Further, in an August 3, 2017, email, ClmsSupervisor (XXXXX) referenced 500 acres of comparable farmland without documenting where such farms were located. *FOF 26.* In challenging Appellants' submission of evidence of claims on comparable acreage, XXXXX also contends that it did not have knowledge of the comparable farms Appellants relied on until just prior to arbitration. *FOF 93 – 94.* As it relates to the claim documents provided on behalf of Farmer2 (XXXXX), I agree

XXXXX could not have considered this information at the time RMA entered its final GFP decision on August 27, 2019. *FOF 88 & 93.* As it relates to the claims documents for Farmer3 (XXXXX) and Farmer4 (XXXXX), the producers were insured by XXXXX, and thus XXXXX had access to these records on August 27, 2019. *FOF 89.* Despite XXXXX's access to the loss claims it paid for Farmer3 (XXXXX) and Farmer4 (XXXXX) in XXXXX counties just north of Appellants' farms and XXXXX staff's general references to comparable acreage, the AIP presented no comparable acreage either before RMA or before the Arbitrator. *FOF 26, 61, 71, & 89.* While the LAM indicates an AIP should consider comparable acreage where it is available, the LAM does not define what qualifies as comparable. As such, I conclude that whether given farmland qualifies as comparable acreage and its impact on the adjustment of a claim become issues of fact subject to arbitration. *See CCI Policy Basic Provisions § 20(d)(1)(ii).*

Having addressed the above arguments, I turn now to whether, based on the state of the evidence at the time RMA issued its final GFP decision on August 27, 2019, XXXXX violated FCIC policies and procedures by failing to re-evaluate Appellants' loss claims. Based on the GFP decisions issued by RMA's SRCO, decisions upheld by RMA's National Office, RMA agreed with XXXXX that Appellants' off-label use of Fusilade DX and their failure to hand-hoe / chop weeds amounted to a failure to follow GFP. *FOF 86.* However, RMA reversed XXXXX's GFP decisions when it found that Appellants' use of cover crop and fertilizer met their Nitrogen requirements, that Appellants' use of Muriatic Potash did not affect the yield or quality of their burley tobacco, and that Appellants' pre-emergence herbicide mixture fell within the recommended range for burley tobacco. *FOF 86.* In addition, there was no dispute that the evidence showed that the area received excessive rainfall during June to early October. *FOF 16, 36, 38, 59 – 61, 69, 71, 73 – 75, 78 – 79, 822, 103, & 108.*

While excessive precipitation / moisture can be an eligible cause of loss, policyholders have the burden of showing that they suffered losses as a result. *See CCI Policy Basic Provisions ¶¶ 12 and 14E(e)(4) (iii).* XXXXX's own claims staff, in photographs and special reports, documented that some portion of eight of Appellants' 14 FSNs (FSNs 178, 553, 966, 2320, 3410, 3655, 5089, and 5318) suffered drowned out or stunted tobacco as a result of the excessive moisture. *FOF 15, 17, 19, 22, 24 – 25, 30, & 59.* In addition, the only photographs XXXXX provided for FSN 7359 were those taken to record the AIP's stubble inspection. *FOF 50.* In a log entry, Adjuster1 (XXXXX) noted that Farmer1 (XXXXX)'s tobacco had been damaged by heavy rain and that at least three acres had been completely drowned out. *FOF 11.* In his deposition, Adjuster1 (XXXXX) confirmed that Appellants experienced heavy rainfall throughout the growing season. *FOF 71.* Further, in confirming that some of the weedy areas were in areas where rain had damaged or destroyed Appellants' tobacco, Adjuster1 (XXXXX) noted that all would have been damaged by excessive moisture throughout the growing season. *FOF 71.* Finally, in a July 28, 2017, email, VP/ClmsMngr (XXXXX) raised his concerns over whether this was a case of excessive moisture in the area causing issues and, as a result, the weeds got away from Appellants due to the moisture. *FOF 20.* What is missing from the record is any evidence that XXXXX attempted to document the losses due to excessive moisture described above, despite the steps it took in using a GPS to document weedy versus weed-free portions of FSN 3655. *FOF 29 – 31, 45 – 46 & 51.* In addition to the evidence provided by XXXXX's claim staff, the AIP's own expert's report indicated his belief that some of the photographs XXXXX provided for his review demonstrated water damage to some of Appellants' burley tobacco. *FOF 82.* The record also contains expert statements provided by Appellants from CoOpMngr (XXXXX), CertCropAdv (XXXXX), and Agronomist1 (XXXXX), which go even further, contending that all of Appellants' losses in yield and quality were due to excessive precipitation / moisture. *FOF 73 – 75.*

In response, RMA and XXXXX point out that the AIP still had concerns over whether Fusilade DX, a post-emergent herbicide used for grass, had an impact on the yield and quality of Appellants' burley tobacco. I find this argument to be unpersuasive as the record includes no showing, either in the form of testimony or in citation to any expert publication, which supports XXXXX's claim that the

application of a post-emergence / post-transplant herbicide impacted tobacco that was a complete or near complete loss as it has been drowned out or stunted by excessive precipitation / moisture. Likewise, the record shows hand-hoeing / chopping would have no impact where complete or near complete plant loss occurred as a result of excessive precipitation / moisture. *FOF 73 – 75 & 82.* While losses in these areas could arguably have been impacted to some extent by Appellants' application of Nitrogen, Muriatic Potash, and pre-emergent herbicide, those issues were removed by RMA's GFP decisions. *FOF 86 & 88.* Having found that the record overwhelmingly establishes that Appellants suffered losses as a result of excessive precipitation / moisture, an insurable cause of loss, I conclude that there is no fact at issue as to whether such losses could be accounted for based on Appellants' failure to follow GFP as it related to their post-transplant weed control program. Further, I conclude that XXXXX failed to follow the requirements of the LAM ¶ 1221, FAD 284, and FAD 102, when the AIP failed to re-evaluate Appellants' loss claims following RMA's final GFP decision on August 27, 2019, in order to confirm that the production due to an eligible cause of loss was not included in the productions assigned to a failure to follow GFP.

Appellants have also raised a challenge to XXXXX's actions as they relate to the impact broadleaf weeds had on Appellants' burley tobacco given their use of a pre-emergent herbicide mixture and the weather experienced during CY 2017. RMA found that Appellants' use of a mixture of pre-emergent herbicides satisfied the requirements for burley tobacco. *FOF 86 & 88.* Further, Appellants' application of pre-emergent herbicides, not their post-transplant use of Fusilade DX, was directed at the control of broadleaf weeds. *FOF 41 – 42.* In evaluating Appellants' tobacco, XXXXX's claims staff extensively documented the presence of weeds, as opposed to just grass, through photographs, special reports, Growing Season Pre-Harvest reports, and emails. *FOF 25 – 26, 31 – 34, 45 – 46, & 49 – 61.* To the extent XXXXX assigned damages based on the presence of broadleaf weeds, Appellants question whether XXXXX followed FCIC policy and procedures. In support of their argument, Appellants cite to the example set out in LAM ¶ 1221A(1), which notes that where an insured uses recognized and accepted measures to control weeds and weather directly caused the control measures to be less effective, FCIC finds this to be an unavoidable insured cause of loss. As further support, Appellants cite to the example set out in LAM ¶ 1221C(2), which notes that in verifying a cause of loss, an AIP should be aware of situations where an apparent loss may be poor weed control; however, the damage may have been indirectly caused by insufficient rainfall to activate properly applied herbicide. In considering Appellants' argument, I note that it addresses the losses to yield and quality of tobacco not drowned out or stunted by excessive precipitation / moisture. I also note that, as of RMA's final GFP decision on August 27, 2019, XXXXX still had concerns as to the impact Appellants' use of Fusilade DX had on Appellants' tobacco crop. *FOF 90 & 102.* Under these circumstances, I conclude that XXXXX's decision as to the production to assign to Appellants' failure to follow GFP as it related to post-transplant weed control and losses attributable to insured causes of loss resulting from the weather's impact on Appellants' proper application of pre-emergent herbicide, was a fact at issue subject to Arbitration. *See CCI Policy Basic Provisions § 20(d)(1)(ii).*

Having found that Appellants showed XXXXX failed to comply with FCIC policy and procedures, I must now turn to whether the evidence shows such failure was willful and egregious. *See Mgr 14-010.* While RMA concedes that this is a requirement for a requestor to obtain a favorable §20(i) finding, the Agency did not reach the issue in its December 23, 2021, decision. *FOF 126.* RMA contends that this was the case as the DAC found Appellants failed to show XXXXX failed to comply with FCIC policy and procedures. *FOF 126.* In its closing argument, XXXXX adopts RMA's position.

As noted above, I conclude that XXXXX failed to comply with FCIC policies and procedures, for this reason I find I must address the requirements set out in Mgr 14-010. Specifically, I must determine whether, when XXXXX failed to follow FCIC policy or procedures, the AIP's actions were willful and egregious. As noted above, documentation provided by XXXXX claims staff clearly demonstrates that the AIP was aware that Appellants experienced excessive moisture during the period from June to early

October. *FOF 16, 36, 38, 59 – 61, 69, 71, 73 – 75, 78 – 79, 822, 103, & 108*. Further, XXXXX's claim staff documented the presence of damage to Appellants' burley tobacco crop through contact log entries, deposition testimony, special reports, photographs, emails, and the report filed by Expert1 (XXXXX). *FOF 11, 15, 17, 19 – 20, 22, 24 – 25, 30, 59, 71, & 82*. Despite this evidence, XXXXX staff failed to take steps to document the drowned out or stunted areas using tools like a GPS; the same steps they used in documenting the existence of weedy and non-weedy portions of FSN 3655. *FOF 29 – 31, 45 – 46, & 51*. Finally, I would note that XXXXX had knowledge as to Adjuster1 (XXXXX)'s statistics concerning the 84 tobacco claims he adjusted for XXXXX in CY 2017 in XXXXX and XXXXX, 24 of which involved burley tobacco. *FOF 71*. Of the 24 burley tobacco claims, XXXXX was aware it had paid 21, most of which Adjuster1 (XXXXX) confirmed were for excessive precipitation / moisture. *FOF 71*. XXXXX's own claims statistics from CY 2017 should have raised a red flag indicating that XXXXX claims staff should have taken steps to document this type of loss. Given this evidence, I conclude XXXXX's conduct in failing to do so was willful and egregious.

**Did RMA err in finding Appellants received the total indemnity due under their policy? No. If no, did RMA err in finding that this was a basis for denying Appellants' request for a favorable determination under ¶ 20(i) of the CCI Policy Basic Provisions? No.**

RMA did not err in finding that Appellants received the total indemnity due under their policies and, as a result, RMA did not err in denying their request for a § 20(i) finding. Establishing that an AIP did not comply with FCIC policy or procedures is not enough to warrant a § 20(i) finding. Under the CCI Policy Basic Provisions § 20(i), the requestor must also demonstrate that the AIP's actions resulted in the requestor receiving payment in an amount that was less than the amount to which they were entitled under their MPCI policy. *See also 7 C.F.R. § 400.352(b)(4); FAD 99*. In its closing argument, RMA argues that NAD has no jurisdiction to review this issue based on RMA's December 3, 2021, decision. Specifically, RMA contends that the DAC never addressed this issue in her decision. I disagree. In reaching my decision, I note that Appellants raised this issue before RMA and XXXXX replied to Appellants' argument. *FOF 118 – 122*. In her December 3, 2021, decision, the DAC pointed out in a footnote that the Arbitrator awarded Appellants the full indemnity due under their policies with interest. *FOF 126*. As Appellants failed to dispute this fact, the DAC indicated in her decision that she would not address the issue further. *FOF 126*. In short, this was an acceptance of XXXXX's argument as to this issue. *FOF 122*. Thus, contrary to RMA's argument in closing, the DAC did in fact reach this issue. Under these circumstances, I conclude this qualifies as an adverse decision subject to NAD review. *See 7 C.F.R. § 11.2(b)*.

Turning to the merits of this issue, I note that Appellants concede that they received the indemnity due under their policies with interest. *FOF 13, 99, 108 – 112, 124, & 129 – 130*. However, Appellants argue that they did not receive what they were entitled to under their policies prior to arbitration. *FOF 108 – 112*. Further, Appellants argue that their economic loss far exceeded the payments due under their policies. Specifically, Appellants presented evidence of extracontractual damages. *FOF 130*. In making this argument, Appellants cite no legal authority in support of their position that such extracontractual damages meet the requirements of § 20(i). Further, in response, XXXXX contends that prior to the Arbitrator's November 2, 2020, award, Appellants had no right to any indemnity payment under their policies based on XXXXX's February 23, 2018, GFP decisions assigning 100 percent of Appellants' losses to a failure to follow GFP. *FOF 64 & 108*. Rather, XXXXX argues that it was the Arbitrator's November 2, 2020, award that triggered Appellants' right to an indemnity payment. *FOF 108*. Further, XXXXX notes that the Arbitrator's award triggered the payment deadlines set out under CCI Policy Basic Provisions § 14(f). A deadline XXXXX met by making final payment to Appellants by November 16, 2020. *FOF 108 – 112*.

In response to XXXXX's argument, Appellants contend that RMA's application of the § 20(i) analysis results in a situation where, regardless of an AIP's conduct in adjusting a loss claim, a requestor who

succeeds at arbitration cannot receive a favorable § 20(i) finding. Taking this one step further, Appellants argue that this results in a situation wherein someone who loses in arbitration, meaning that they receive something less than the full amount due under their policy, is eligible to receive a § 20(i) finding, while someone who is fully successful at arbitration, meaning they receive the full indemnity due under their policy, is not. As a result, Appellants point out that someone who is unsuccessful at arbitration can receive the § 20(i) finding and seek extracontractual damages, while someone who is successful at arbitration cannot. In response, XXXXX notes that the language in § 20(i) of the CCI Policy Basic Provisions is set out in 7 C.F.R. § 457.8. *See also 7 C.F.R. § 400.352(b)(4)*. Accordingly, XXXXX argues that Appellants cannot use NAD proceedings to challenge USDA regulations issued under Federal law. Given the legal framework, I conclude that XXXXX's argument in this regard is persuasive. Thus, I must conclude that RMA did not err in finding that Appellants failed to show they received less than the indemnity due under their policies and, thus, are not entitled to a § 20(i) finding.

## DETERMINATION

Seven C.F.R. § 11.8(e) provides that an appellant bears the burden of proving that an agency's adverse decision is erroneous by a preponderance of the evidence. While Appellants have shown RMA erred as to the issue of XXXXX's compliance with FCIC policy and procedures, they failed to show RMA erred as it relates to Appellants' receipt of the full indemnity due under their policies, with interest. As Appellants failed to show error as to both issues, I find RMA's decision denying Appellants' request for a § 20(i) finding is not erroneous.

This is a final determination of the Department of Agriculture unless a timely request for review is filed.

Dated and distributed this **15th** of **June 2023.**

/s/

Mark A. Nelson
Administrative Judge
National Appeals Division

[1]
___ The Appeal Record includes 12,636 pages of agency record (a portion of which includes transcripts that are printed 4 pages per page) and 57 separate exhibits (totaling 1,099 pages). Further, the appeal involved nine days of hearing, with approximately 26.5 hours of audio. In addition, the parties filed closing arguments that total 114 pages.

[2]
___ Farmer2 (XXXXX) is not a party to this appeal as his CY 2017 Multiperil Crop Insurance (MPCI) was with XXXXX, not XXXXX. In CY 2017, Farmer2's (XXXXX) operation included both row crops and tobacco.

[3]
___ To demonstrate the extent of their operations in CY 2017, Appellants provided a series of photographs depicting the different phases of their tobacco operation. *(AR, pages 5689 – 5696, 5743 – 5769, 5821 – 5825, 5836 – 5845, 5847 – 5860, 8661 – 8671, 8685, & 8691 – 8693; Appellants' Exhibit C, pages 1 – 3.)*

[4]
___ Although FSN 5318, Tract 19723, appears on Appellant1's (XXXXX) XXXXX County FSA-578 Producer Print, the physical location of crop is reflected as XXXXX, County, XXXXX.

[5]
___ This is AdjTrainee's (XXXXX) maiden name. While these claims were pending before XXXXX, AdjTrainee (XXXXX) married, becoming XXXXX.

[6]
___ *See AR, pages 2880 – 2885, 2934 – 2939, & 3236 – 3241; HA, Trk 8, 47:40 – 48:40.*

[7]
___ *See AR, pages 3050 – 3054, 3089 – 3094, & 3242 – 3247; HA, Trk 8, 47:40 – 48:40.*

[8]
___ *See AR, pages 3248 – 3253, 6842 – 6847, & 6872 – 6876; ; HA, Trk 8, 47:40 – 48:40.*

[9]
___ This is a typo and should be FSN 2320, not FSN 2230.

[10]
___ The photographs are identified as FSN 2230, which is a typo and should be FSN 2320.

[11]
___ See FOF 17 for a complete listing of the citations to the documents Adjuster1 (JP) provided.

[12]
___ See FOF 20 for a complete listing of the citations to the documents VP/ClmsMngr (XXXXX) provided.

[13]
___ XXXXX resubmitted these photographs with different narrative language. The language was revised by Adjuster1 (XXXXX) and no longer indicates that the insured got stuck three times and quit spraying. As revised, the language indicates the insured said they were sprayed the same. *(XXXXX Exhibit M, pages 259 – 273; XXXXX Exhibit P, pages 1 – 2.)*

[14]
___ *See AR, page 3466.*

[15]
___ *See AR , page 3214.*

[16]
___ The photographs are identified as FSN 66-8, which is a typo and should be FSN 103.

[17]
___ The photographs are identified as FSN 377, which is a typo and should be FSN 3777.

[18]
___ The photographs are identified as FSN 377, which is a typo and should be FSN 3777.

[19]
___ See FOF 25 for a complete listing of the citations to the documents Adjuster1 (XXXXX) provided.

[20]
___ XXXXX did not learn until arbitration that Appellants had spot sprayed Fusilade DX on its fields. During his at arbitration testimony, Appellant1 (XXXXX) confirmed that Appellants spot sprayed the Fusilade DX, applying it only to areas that needed it. XXXXX was aware the Appellants had gotten stuck with their sprayer and that for this reason some fields were not sprayed. *(XXXXX Post-Hearing Exhibit B, pages 5 – 6; HA, Trk 8, 1:04:00 – 1:12:40; HA, Trk 9, 31:06 – 31:30.)*

[21]
___ See FOF 38 for a complete listing of the citations to the documents AdjTrainee (XXXXX) included with her emails.

[22]
___ Farmer1 (XXXXX) passed away on June 9, 2017. (AR, page 2473; Appellants' Post-Hearing Exhibit D, page 36.)

[23]
___ Specific testimony referenced in FOF is at AR, pages 1099 & 1104 – 1106.

[24]
___ During the hearing, XXXXX suggested that after RMA's GFP decisions, the AIP did more than scan and file the decisions. Specifically, XXXXX contends it held informal discussions to review the RMA decisions. To the extent this implies that XXXXX reconsidered its decision to apply 100 percent of Appellants' losses to uninsurable cause of loss, I find it is contrary to the Arbitrator's findings (See Arbitration FOF 23). *(AR, pages 2476 – 2477; XXXXX Post-Hearing Exhibit B, pages 12 – 14; HA, Trk 8, 1:20:05 – 1:22:30; HA, Trk 9, 1:07:06 – 1:22:55.)*

[25]
___ Specific testimony referenced in FOF is at AR, pages 1317 – 1320, 1328 – 1329, 1333 – 1334, & 1387 – 1390.

[26]
___ Specific testimony referenced in FOF is at AR, page 1177.

[27]
___ ClmsSupervisor (XXXXX) confirmed during his deposition that he did not contact any experts concerning Appellants' CY 2017 burley tobacco. Further, RMA has no record of any email exchanges between XXXXX, PhD (ExtSpc (XXXXX)), a XXXXX Extension Tobacco Specialist, and either Adjuster1 (XXXXX) or ClmsSupervisor (XXXXX). *(AR, page 1105; Agency Post-Hearing Exhibit 1, page 1.).)*

[28]
___ Specific testimony referenced in FOF is at AR, pages 1496 – 1497, 1537, 1542 – 1544, & 1546.

[29]
___ The table of photos and invoices Appellants provided as Appellants' Post-Hearing Exhibit C, pages 1 – 3, fails to account for additional photographs of Appellants' CY 2017 tobacco operations, to include AR, pages 5689 – 5691, 5693 – 5696, and 5767.

[30]
___ See FOF 81 for a complete listing of the citations to the documents AppRep (XXXXX) provided.

[31]
___ As noted previously, during the hearing XXXXX suggested that after RMA's GFP decisions, the AIP did more than scan and file the decisions. Specifically, XXXXX contends it held informal discussions to review the RMA decisions. To the extent this implies that XXXXX reconsidered its decision to apply 100 percent of Appellants' losses to uninsurable cause of loss, I find it is contrary to the Arbitrator's findings (See Arbitration FOF 23). *(AR, pages 2476 – 2477; XXXXX Post-Hearing Exhibit B, pages 12 – 14; HA, Trk 8, 1:20:05 – 1:22:30; HA, Trk 9, 1:07:06 – 1:22:55.)*

[32]
___ In arbitration documents, XXXXX is referred to as "Respondent," and Appellants are referred to as "Claimants." When referencing arbitration documents, these terms have been added for clarity.

[33]
___ This contradicts the statement by ClmsSupervisor (XXXXX) indicating he reviewed 500 comparable acres and the statement by AdjTrainee (XXXXX) that Appellants' losses were not similar to those of neighboring producers. Likewise, I note that in closing, XXXXX referred to the tobacco claims Adjuster1 (XXXXX) reviewed in XXXXX during CY 2017. *(See FOF 26, 61, & 71; XXXXX Post-Hearing Exhibit B, page 25.)*

[34]
___ In support of its position that such re-evaluation is not required under FCIC policy and procedures, XXXXX has cited to various portions of the LAM and the GFP Handbook (HB). As GFP HB ¶1(c) makes clear that policy provisions, FADS, and managers bulletins take precedence over handbooks, I find XXXXX's argument in this regard to be without merit.